[No. C000037. Third Dist. May 5, 1988.]

JAMES RAY, Plaintiff and Appellant, v.
FARMERS INSURANCE EXCHANGE, Defendant and Respondent.

COUNSEL

Nathaniel S. Colley, Sr., and John E. Wolfgram for Plaintiff and Appellant.

Dennis M. Campos, Charity Kenyon and Diepenbrock, Wulff, Plant & Hannegan for Defendant and Respondent.

OPINION

**EVANS, Acting P. J.**—Plaintiff James Ray (Ray) appeals from the judgment following a jury's general verdict for defendant Farmers Insurance Exchange (Farmers) on Ray's breach of contract and related actions.[1] Ray asserts prejudicial instructional error and insufficiency of the evidence to support the verdict. The linchpin in Ray's case is Farmers's alleged obligation, under the terms of an automobile collision insurance policy, to compensate Ray, after repair of his wrecked car, for the car's diminution in market value because of its status as a wrecked car. We shall affirm the judgment.

FACTS

On October 25, 1979, a United Parcel Service (UPS) truck collided with Ray's 1978 Sapporo, which was parked in front of Ray's home. Ray had purchased the car about 10 months earlier, and it had a little over 8,000 miles on it at the time of the collision. The car was covered against loss by a collision insurance policy with Farmers.

Ray had the car towed to Vandenberg Motors for repair. He then phoned his insurance agent, Kevin Finn, to report the collision. Ray wanted a new

---

[1] Ray also alleged breach of the implied covenant of good faith and fair dealing, intentional tort, and violation of Insurance Code section 790.03, subdivision (h)(3).

car. Without denying coverage, Finn suggested that, because UPS's liability appeared clear, Ray might have the claim handled more expeditiously and would save putting out his deductible if he dealt directly with UPS.

Ray contacted UPS, which referred him to its insurer, Liberty Mutual Insurance Company.[2] Liberty Mutual prepared a repair estimate, which was accepted by Vandenberg Motors with the understanding that it was subject to supplementation.

Meanwhile, Finn reported the loss to Farmers. Farmers audited and accepted Liberty Mutual's repair estimate, which was about $4,000. At the time of the collision, Ray's car had a market value of $7,100. After the collision, its salvage value was $1,650. Farmers notified Ray that it would pay for the cost of repair if Liberty Mutual did not. Both Farmers and Liberty Mutual refused Ray's demand, however, to replace the car or, alternatively, to guarantee the difference, if any, in the car's market value before the collision and after repair.

Vandenberg Motors repaired the car at a cost to Liberty Mutual, including supplemental work, of $4,521. The car was returned to Ray in March of 1980. Over the following 15 months, Ray took the car back to Vandenberg Motors several times for corrective mechanical and cosmetic work, all of which was done at no cost to Ray. Ray's primary complaint was a problem with the front end's shimmying at low speeds and with the car's pulling to the right upon braking. Vandenberg Motors worked on the problem, eventually "improv[ing] it a whole lot."

At trial, Ray presented evidence that the car continued to veer to the right upon hard braking. The evidence disclosed that the problem manifested itself, however, only at freeway speeds and not with city driving. About three or four months before trial (the trial was conducted in June 1984), an auto body expert examined Ray's car, using relatively new, state-of-the-art laser equipment. This examination revealed the cause of the car's handling problem to be misalignment of the front suspension cross-member and of the struts.

George Jump managed Vandenberg Motors's body shop at the time Ray had his car repaired there. Jump would not accept a wrecked car for repair work if it could not be repaired to a condition as good as or better than the car was in before the accident. Nor would Jump deliver to a customer a repaired car in an unsafe condition. Believing Ray's car repairable, Jump

---

[2] Ray also filed actions against UPS and Liberty Mutual, which were settled prior to trial in this case.

accepted the job for its repair. In Jump's opinion, Ray's car was returned in a well-repaired, safe, and cosmetically good condition.

Albert Bishop succeeded Jump as Vandenberg Motors's body shop manager in April of 1981. In the summer or late fall of 1981 or 1982, Ray brought his car into the shop and asked to have the front end checked because, he said, he was having continuing handling problems from the 1979 accident. An inspection of the car's underside revealed damage to the frame's right front cross-member, consistent with the car's having been driven over a cement parking stop. Bishop was skeptical of Ray's report that the front end problem he was experiencing was a result of the 1979 accident; the frame damage Bishop saw was fresh, at the most a month old. Bishop did not offer to repair the car, and Ray did not appear surprised by Bishop's assessment that the damage to the car's frame was recent.

Ray testified that, in his opinion, his car's market value after repair was about $5,500. John Vandenberg, an automobile dealer, testified that he discounts a car's value by 50 percent if it has sustained collision damage costing more than half of the car's preaccident value to repair.

## DISCUSSION

This case is fundamentally a matter of contract interpretation—i.e., whether Ray's collision insurance policy with Farmers provided coverage for diminution in the market value of his repaired car because of its status as a wrecked car. Ray contends the evidence at trial compelled a verdict in his favor on this point. He also contends instructional error misled the jury and had the effect of removing the issue from its consideration.[3] We need not consider the latter contention or the other assignments of error; they all fail because they are premised on a faulty foundation—that Farmers had a contractual obligation to pay the diminution in value claimed.

We begin our discussion with some basic propositions. ■ The meaning to be ascribed to an insurance policy, as with any contract, is a question

---

[3] Ray's contentions are raised in an amended opening brief. After Ray's original opening brief was filed, Farmers moved to correct the reporter's transcript on appeal. The motion was granted, the matter sent back to the trial court, and a corrected transcript thereafter filed. We then permitted Ray to refile an amended brief on the basis of corrections to the record. Farmers, in its brief, incorporates a motion to strike Ray's amended opening brief as not conforming to our order that it be based on corrections to the record. We deny Farmers's motion, as it does not conform to California Rules of Court, rule 41(a) ("[I]f the motion is based on matters not appearing of record, [it shall be accompanied] by affidavits or other evidence in support thereof."). Ray's original opening brief is not a matter appearing of record, as that brief was stricken from the files when Ray was granted permission to refile an amended brief. (See Cal. Rules of Court, rule 18.)

of law. It is a matter, in the first instance, for the trial court's determination, not the jury's. And unless interpretation of the policy turns on the credibility of extrinsic evidence, an appellate court may independently determine the policy's meaning regardless of what the trial court may have concluded. (See *Bareno* v. *Employers Life Ins. Co.* (1972) 7 Cal.3d 875, 881 [103 Cal.Rptr. 865, 500 P.2d 889]; *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; *California Shoppers, Inc.* v. *Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 35 [221 Cal.Rptr. 171]; Evid. Code, § 310, subd. (a).) ■ As a general rule, ambiguities and uncertainties in a policy of insurance are resolved in favor of the insured. (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168].) An insurance policy is not rendered ambiguous or uncertain, however, because of a strained or grammatically incorrect reading of the policy's terms. (*Atlas Assurance Co.* v. *McCombs Corp.* (1983) 146 Cal.App.3d 135, 144 [194 Cal.Rptr. 66].) "Although we construe all provisions, conditions, or exceptions that tend to limit liability strictly against the insurer [citation], strict construction does not mean strained construction. [Citations.] We may not, under the guise of strict construction, rewrite a policy to bind the insurer to a risk that it did not contemplate and for which it has not been paid." (*Safeco Ins. Co.* v. *Gilstrap* (1983) 141 Cal.App.3d 524, 532-533 [190 Cal.Rptr. 425].) The words used in a policy of insurance are to be construed according to the plain meaning a layman would ordinarily attach to them, and the policy is to be construed as a whole, each clause helping to interpret the other. (*McBride* v. *Farmers Ins. Group* (1982) 130 Cal.App.3d 258, 260-261 [181 Cal.Rptr. 539, 42 A.L.R.4th 1139].)

The insurance policy at issue here includes the following provision limiting coverage for loss caused by collision: "The limit of the Company's liability for loss shall not exceed the actual cash value of the damaged . . . property, or if the loss is of a part, its actual cash value, at the time of loss, nor what it would then cost to repair or replace the damaged . . . property or part with other of like kind and quality, less depreciation." The policy further provides: "The Company may pay for the loss in money or may repair or replace the damaged . . . property or any of its parts, . . ." Thus, the policy unambiguously gave Farmers the right to elect to repair Ray's vehicle if the cost to repair to "like kind and quality" was less than the actual cash value of the vehicle at the time of loss.

In *Owens* v. *Pyeatt* (1967) 248 Cal.App.2d 840 [57 Cal.Rptr. 100], at page 849, the court construed nearly identical policy provisions: "The type and extent of repair contemplated by this provision were such as would place the automobile in substantially the same condition it was before the accident. . . . If the damage was such the automobile could not be restored to this condition [the insurer] was required to pay the actual cash value thereof

at the time of loss." The question presented was whether the insurer's election to repair is conclusive. The answer was yes, provided the repair places the automobile substantially in its preaccident condition. If it does not, then the automobile is deemed a total loss and the insurer is liable for the preaccident value of the car. ■ We do not read *Owens* as requiring the insurer, under these circumstances, to repair the automobile to both its preaccident condition *and* market value. "Where the insurer, in the exercise of its option to repair, restores the automobile to its *normal running condition,* there is by hypothesis no total loss of the insured vehicle." (15 Couch on Insurance (2d ed. 1983) § 54:29, p. 432, italics added.) Ray's reliance on *Merchant etc. Assn.* v. *Kellogg E. & D. Co.* (1946) 28 Cal.2d 594 [170 P.2d 923], at page 600, for the proposition that Farmers is liable for diminution in market value of a repaired car is misplaced. *Merchant etc. Assn.* involved liability for damages in tort, not in contract. Rules applicable to recovery in tort do not apply to an action on a contract of insurance. (See 6 Appleman, Insurance Law and Practice (1972) § 3881, p. 360, fn. 5.45.)

*Owens* did not define "like kind and quality" other than to note that it means "substantially the same condition [as] before the accident." (248 Cal.App.2d at p. 849.) By Ray's hypothesis, "like kind and quality" (or "substantially the same condition") is the equivalent of "actual cash value" at the time of loss. Such an expansive interpretation of the policy's language does not survive our rules of policy construction. As a practical matter, one may assume that any automobile sustaining significant collision damage will lose some market value after repairs. To hold Farmers liable for the automobile's diminution in value would make Farmers an insurer of the automobile's cash value in virtually all cases and would render essentially meaningless its clear right to elect to repair rather than to pay the actual cash value of the vehicle at the time of loss. Moreover, the language of the limiting clause shows that Farmers knew how to say "value" when it meant "value"—Farmers limited collision coverage to the lesser of the "actual cash value" of the automobile or the cost to repair to "like kind and quality" at the time of loss. We may assume that, had the policy provision been intended to guarantee the market value of the automobile after an election to repair, it would have used the phrase "actual cash value" instead of "like kind and quality." The policy language unambiguously reserves to Farmers the right to elect the most economical method of paying claims. Ray's strained interpretation would gut that right and hold Farmers to a risk it did not contemplate nor one for which Ray paid. Indeed, we may assume that for an extra premium Ray could have purchased a valued policy of insurance, which would have provided the coverage he seeks from this open policy. (See Ins. Code, §§ 410, 411, 412; 6 Appleman, Insurance Law and Practice, *supra,* §§ 3827, 3828, pp. 245, 250.)

We recognize that, in various contexts, some jurisdictions have construed similar policy language as providing for recovery of diminution in value despite the quality of repair. (See generally Annot., Measure of Recovery by Insured Under Automobile Collision Insurance Policy (1955) 43 A.L.R.2d 327, 342-346; 6 Appleman, Insurance Law and Practice, *supra,* § 3883, p. 368; 15 Couch on Insurance, *supra,* § 54:151, p. 540.) We decline to follow those authorities. We will not rewrite an otherwise unambiguous limitation of collision coverage to provide for a risk not bargained for. To the extent Ray's automobile was repaired to its preaccident safe, mechanical, and cosmetic condition, Farmers's obligation under the policy of insurance to repair to "like kind and quality" was discharged. The evidence on this point was conflicting. Although the automobile indisputedly had mechanical and handling problems at the time of trial, there was evidence that the cause of the problem was of recent origin and not attributable to the collision. ■■ ■■ ■■■ ■■■ A jury could have reasonably concluded on this state of the evidence that Farmers's contractual obligation to Ray was discharged.[4]

The judgment is affirmed.

Deegan, J.,* concurred.

**CARR, J.**—I dissent. The majority's conclusion that diminution in market value of a repaired automobile by reason of its status as a wrecked car is not recoverable under the collision policy at issue herein, is, in my view, a windfall for the insurer, Farmers. The majority's holding excused it from considering and determining whether the trial court prejudicially erred in instructing the jury on and submitting for the jury's determination the legal issue of whether the contract obligated the insurer to pay its insured for loss of market value. I have considered the issue, tendered by appellant, find submitting this legal issue to the jury to be erroneous, the instructions to be improper and the error prejudicial. I would reverse the judgment.

---

[4] In his reply brief, Ray attempts to save his argument that Farmers is liable for the diminution in value of his repaired car by ascribing the obligation not to the terms of the policy of insurance but to the implied covenant of good faith and fair dealing. This contention must fail. As a general rule, breach of the implied covenant of good faith and fair dealing presupposes a breach of the contract's express terms. The covenant of good faith and fair dealing "is the obligation, deemed to be imposed by the law, under which the insurer must act fairly and in good faith in *discharging its contractual responsibilities.* Where in so doing, it fails to deal fairly and in good faith with its insured by refusing, without proper cause, to compensate its insured *for a loss covered by the policy,* such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing." (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 574 [108 Cal.Rptr. 480, 510 P.2d 1032], italics added, italics omitted.) As there was no actual breach of contract in this case, a fortiori no action will lie for an alleged tortious breach of contract.

*Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.

I

The interpretation of the policy is a question of law. (Evid. Code, § 301, subd. (a).) Initially, it is the trial court's function to determine what the policy means and to instruct the jury accordingly. It is error to leave the interpretation to the jury. (*Ibid.*; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; *California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 35 [221 Cal.Rptr. 171].) Unless the interpretation turns on the credibility of extrinsic evidence, the trial court's interpretation is not conclusive if an appeal is taken. An appellate court is free to disregard the trial court's interpretation and to reach its own independent determination of the meaning of the policy provisions. (*Bareno v. Employers Life Ins. Co.* (1972) 7 Cal.3d 875, 881 [103 Cal.Rptr. 865, 500 P.2d 889].) Any ambiguities in the contract are to be construed in favor of the insured. (Gov. Code, § 1654; *Silberg v. California Life Ins. Co.* (1974) 11 Cal.3d 452, 464 [113 Cal.Rptr. 711, 521 P.2d 1103].) The words used in a policy of insurance are to be interpreted in their ordinary and popular sense, as a person of average intelligence and experience would understand them. (*Delgado v. Heritage Life Ins. Co.* (1984) 157 Cal.App.3d 262, 272 [203 Cal.Rptr. 672].)

In the present case, plaintiff's claim for breach of contract based on Farmer's failure to pay for diminution in value derives from the following provision contained in the insurance contract: "The limit of the Company's liability for loss shall not exceed the actual cash value of the damaged or stolen property, or if the loss is of a part, its actual cash value, at the time of loss, nor what it would then cost to repair or replace the damaged or stolen property or part with other of like kind and quality, less depreciation."

The policy further provides the insurer "may pay for the loss in money or may repair or replace the damaged or stolen property or any of its parts . . . ."

This appears to be a case of first impression in California. In *Owens v. Pyeatt* (1967) 248 Cal.App.2d 840 [57 Cal.Rptr. 100], in which a policy provision almost identical with the one herein was at issue, the court did not definitely address the issue of the recovery of diminution of value damages. What the court did was hold that an insurer under the policy provision at issue is liable for the preaccident value of a vehicle restored to its preaccident physical condition while suffering a loss in value would be considered repaired to "like kind and quality." The court did not define "like kind and quality" other than to note that it means "substantially the same condition [as] before the accident." (*Id.,* at p. 849.) The majority does not construe *Owens* as requiring an insurer to both repair a wrecked automobile to its

preaccident physical condition and market value and follows that conclusion with a quote from Couch on Insurance that " '[w]here the insurer, in the exercise of its option to repair, restores the automobile to its *normal running condition,* there is by hypothesis no total loss of the insured vehicle.' " (Maj. opn., p. 1417.) The Couch statement is not this case either as to the language of the policy provision or the condition of the vehicle at issue. The Ray automobile was not totalled, though there may be those who assert it should have been, and the policy provision was not restoring the automobile to "its normal running condition" but repaired "with other like kind and quality." That is the problem with the analysis of the majority opinion and like opinions of other jurisdictions which permit no recovery for diminution in value. Like kind and quality is equated with the physical condition of the car, not the market value. Like kind and quality are the critical words of this policy provision. If a car is repaired but it has a substantially diminished value because of its status as a repaired wrecked car, can it be said that it is of like kind and quality as before the accident causing the damage?

As the majority has noted, courts in other jurisdictions have developed two distinct lines of authority in the construction of insurance clauses similar to the one herein.

Various jurisdictions have ruled the insurer is not liable for diminution in value under an insurance contract provision requiring the insurer to "repair or replace" with "like kind and quality."

In *Bickel* v. *Nationwide Mutual* (1965) 206 Va. 419 [143 S.E.2d 903], the Virginia court interpreted the phrase "to repair or replace the property or such part thereof with other of like kind or quality" to deny recovery for diminution of value, reasoning that the insurer was obligated only to repair or replace the damaged parts with like kind or quality. In *General Accident Fire & Life Assurance Corp.* v. *Judd* (Ky. 1966) 400 S.W.2d 685, the Kentucky court construed similar language to refer only to the physical condition and not the market value. Similar rulings have been made by courts in Illinois (*Haussler* v. *Indemnity Co. of America* (1923) 227 Ill.App. 504) and South Dakota (*Stucker* v. *Travelers Indemnity* (1957) 77 S.D. 27 [84 N.W.2d 566]). In each of these cases, the contract language was interpreted to require only restoration of physical condition, not restoration of value.

What appears to be a majority of jurisdictions have found diminution in value a recoverable item of damage under contract language essentially identical to that in the present case. In *Superior Pontiac Co.* v. *Queen Insurance Co. of Amer.* (Tex. 1968) 434 S.W.2d 340, the Texas Supreme Court held the cost of repairs of a stolen but recovered vehicle would not

compensate the insured for the loss she had suffered because it would not restore the automobile to substantially its former condition and value. In so holding the Supreme Court reversed the ruling of the Court of Appeals of Texas that "repair" and "replace" in the insurance policy meant restoration of the car to substantially the same condition as before the theft. Similar rulings have been made by the courts of Oregon (*Rossier* v. *Union Automobile Ins. Co.* (1930) 134 Ore. 211 [291 P. 498]; *Dunmire Motor Co.* v. *Oregon Mut. Fire Ins. Co.* (1941) 166 Ore. 690 [114 P.2d 1005]); Kansas (*Venable* v. *Import Volkswagen, Inc.* (1974) 214 Kan. 43 [519 P.2d 667, 68 A.L.R.3d 1184]); South Carolina (*Campbell* v. *Calvert Fire Ins. Co.* (1959) 234 S.C. 583 [109 S.E.2d 572]); Georgia (*Dependable Insurance Co.* v. *Gibbs* (1962) 218 Ga. 305 [127 S.E.2d 454]); and Mississippi (*Potomac Insurance Co.* v. *Wilkinson* (1952) 213 Miss. 520 [57 So.2d 158, 43 A.L.R.2d 321]).

I believe the correct and more enlightened view is that espoused by a majority of jurisdictions, that contract provisions which require the insurer when repairing or replacing a damaged vehicle with "other of like kind and quality" to pay for any diminution in value of the repaired automobile by reason of its status as a wrecked car. The reasoning of the court in *Campbell* v. *Calvert Fire, supra,* 234 S.C. 583 [109 S.E.2d 572], demonstrates the soundness of this position.

In *Campbell,* the insurance contract provided: "The limit of the company's liability for loss shall not exceed either (1) the actual cash value of the automobile, or if the loss is of a part thereof the actual cash value of such part, at time of loss or (2) what it would then cost to repair or replace the automobile or such part thereof with other of like kind and quality, with deduction for depreciation, or (3) the applicable limit of liability stated in the declarations. [¶] 'The company may pay for the loss in money or may repair or replace the automobile or such part thereof, as aforesaid . . . .' " (109 S.E.2d at p. 575.)

The insured, who repaired his automobile before reporting the accident, testified he sustained a total loss and the trial court rendered judgment for the insured in the sum of $1500. The South Carolina Supreme Court reversed and remanded, holding this testimony did not sustain recovery on the basis of total loss. In discussing the measure of damages for retrial, the court stated: "The purpose of a policy of this kind is to compensate the insured in full for any loss or damage to his automobile less any deduction specified. Under its terms, the Company has the option after a collision of having the automobile repaired. As pointed out in *Rossier* v. *Union Automobile Insurance Co.,* 134 Or. 211, . . . 'In many instances the injury to the automobile may be of such nature and extent that, after repairs have been made, there will be no diminution of value. Under such circumstances the

cost of repairs would be equivalent to the difference between the value of the automobile before and after collision'. But as there pointed out, restoration of the car to its former condition 'may nor may not be accomplished by repair or replacement of broken or damaged parts. It cannot be said that there has been a complete restoration of the property unless it can be said that there has been no diminution of value after repair of the car.' In *America Standard County Mutual Insurance Co.* v. *Barbee,* Tex. Civ. App., 262 S.W.2d 122, 123, the Court said: 'The words "repair" and "replace" used in a policy of this kind mean the restoration of the automobile to substantially the same condition in which it was immediately prior to the collision and it would not be restored to the condition if the repairs left the market value of the automobile substantially less than the value immediately before the collision.' " (109 S.E.2d at p. 576.) The court in *Campbell* concluded: "It follows . . . that where there is a partial loss and the automobile can be repaired and restored to its former condition and value, the cost of repairs is the measure of liability, less any deductible sum specified in the policy. *But if, despite such repairs, there yet remains a loss in actual value, estimated as of the collision date, the insured is entitled to compensation for such deficiency.* Under these circumstances some courts adopt as the measure of damages the difference between the fair cash value of the car before and after the collision. [Citations.] Other courts achieve substantially the same result by adding any diminution in value to the cost of repairs. [Citations.] . . . [¶] Either of the foregoing methods assures fair protection under a policy of this kind." (109 S.E.2d at pp. 576-577, italics added.)

Similarly, in *Venable* v. *Import Volkswagen, Inc., supra,* 519 P.2d 667, the Kansas Supreme Court interpreted the following phrase: " 'The limit of the Company's liability for loss shall not exceed the actual cash value of the damaged or stolen property, if the loss is of a part, its actual cash value, at the time of loss, *nor* what it would then cost to repair or replace the damaged or stolen property or part with other of like kind and quality, less depreciation.' " (*Id.,* at p. 672, original italics.) In upholding a jury award for the insured of the loss in value after repairs, the court stated: "When an insurer makes an election to repair or rebuild under a 'repair, restore or replace clause' in its policy the insurer is then obligated to put the vehicle in substantially the same condition as it was prior to the collision so as to render it as valuable and as serviceable as before." (*Ibid.*)

This interpretation is the only reasonable construction of a contract provision requiring an insurer to "repair or replace" the damaged property or part with other of "like kind and quality." To permit the insurer to repair the car to comparable physical condition and function while its value has plummeted does not compensate the insured with a car of "like kind and quality" as the average person would understand those words. The purpose

of the policy is to compensate plaintiff for any loss or damage, less any deduction. Plaintiff is entitled to have a car just as valuable as the car was before the accident. Anything less would not be adequate compensation for the loss sustained.

I find unpersuasive the majority's conclusion that this interpretation of the policy language would "render essentially meaningless [Farmer's] clear right to elect to repair rather than to pay the actual cash value of the vehicle at the time of loss." (Maj. opn., p. 1417.) In many instances, the total cost of repairs plus any diminution in value would not approach the preaccident value of the automobile. Farmers is not deprived of its right to elect to repair the damaged vehicle as the most economical means of paying claims; rather, Farmers may not elect to restore the car to its preaccident physical condition without compensating for loss of value when such election deprives plaintiff of his contractual right to an equally valuable automobile. I conclude that, as a matter of law, the provisions require the insured to restore the vehicle to its preaccident value.

In this case, the trial court did not construe the language of the policy and therefore did not instruct the jury as to the applicable law. The lower court apparently determined diminution in value was a proper element of damages under the policy as Farmer's demurrer to plaintiff's first cause of action embodying the breach of contract claim.[1] Nevertheless, the court refused to instruct the jury with plaintiff's proposed instruction No. 6 which provided: "If the automobile could not be repaired to like kind and quality, or if repaired, the repaired vehicle was not of like kind and quality, plaintiff was entitled to either (1) be paid the actual cash value of his vehicle at the time of the collision, (2) have his car replaced with one of like kind and quality, or (3) be paid the difference between the actual cash value of the car at the time of the collision, less its actual cash value after repairs."

Stating that proposed instruction No. 6 was encompassed within instruction No. 29, the court instructed the jury: "If you find that plaintiff's automobile could not reasonably be restored to a condition of like kind and quality as it was prior to the collision, and if you find that defendant's failure to pay plaintiff the actual cash value of the said vehicle was a breach of its contract of insurance, then you may award plaintiff the difference between the actual cash value of the said vehicle at date of the accident and after repair. . . ."

---

[1]The record lacks a copy of the order overruling Farmer's demurrer to plaintiff's third amended complaint. It shows only that the matter was argued and submitted and that Farmers thereafter answered the third amended complaint. The record does reflect, however, that the court overruled Farmer's demurrer to plaintiff's second amended complaint. It appears the court considered diminution in value as a proper element of damages as the issue was raised in closing argument to the jury.

In instructing the jury in the language of instruction No. 29, the trial court submitted for the jury's determination the legal question concerning the duty owed by Farmers to its insured under the provisions of the policy. This was error.[2] The question of whether the contract obligated Farmers to pay plaintiff for his car's diminution in value after repairs restored it to its preaccident physical condition was not a factual issue. The only factual issues which should have been submitted to the jury were whether the automobile was restored to its preaccident operating condition and whether there was any diminution in value after the repairs were completed, not whether the defendant insurer breached the insurance contract by its failure to pay the actual cash value of the vehicle. This was a legal issue.

The trial court's refusal to instruct the jury with plaintiff's proposed instruction No. 6 while incorrectly submitting the legal question of the contract's meaning to the jury pursuant to instruction No. 29 constitutes reversible error. Although a trial court may properly refuse an instruction on the ground that the point is covered by other instructions, the court's refusal to give a proper instruction or the giving of an improper instruction, may be reversible error if it is affirmatively shown the error was likely to mislead the jury. (7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 240, pp. 246-247.) In this case, the error misled the jury as the instruction given did not inform the jury of the duty imposed upon Farmers under the contract. It was incumbent upon the trial court to properly instruct the jury on the controlling legal principles applicable to the case so that the jury would have a complete understanding of the facts. The jury returned a general verdict for Farmers. Therefore, I cannot discern whether the jury determined Farmers owed no duty to pay for diminution in value or whether it believed plaintiff had not proven actual loss of market value after the repairs to his car. Under these circumstances, the error must be deemed

---

[2] Farmers urges that plaintiff may not complain of any error in instruction No. 29 as he "invited" the error by proferring instruction No. 5. Plaintiff's proposed instruction No. 5 provided: "If you find that plaintiff's automobile could not reasonably be restored to a condition of like kind and quality as it was prior to the collision, and if you find that defendant's failure to pay plaintiff the fair market value of the said vehicle was a bad faith breach of its contract of insurance, then you may award plaintiff the greater of the fair market value of the said vehicle or the reasonable value of the loss of use of the said vehicle from the date of the said bad faith breach to the date of your judgment. The value of loss of use is the fair rental value of an automobile of like kind and quality as plaintiff's vehicle was prior to the collision over the period of time in question." Farmers urges the changes to this instruction which were incorporated into instruction No. 29 were favorable to plaintiff as they omitted the reference to proving "bad faith" breach of contract, thereby lowering plaintiff's burden of proof. The argument is specious as Farmers misconstrues the purpose of the proposed instruction. Plaintiff hoped the court would instruct the jury with this instruction so that the jury would determine the factual question whether Farmers acted in bad faith for the purpose of deciding plaintiff's claims charging breach of the covenant of good faith and fair dealing and related actions. In removing the bad faith language, the trial court transformed a factual question into a legal one not properly submitted to the jury.

prejudicial as it is unclear whether a result more favorable to plaintiff may have ensued had proper instructions been given.

I would therefore reverse the judgment.[3]

A petition for a rehearing was denied June 1, 1988.

---

[3] As I conclude this instructional error mandates reversal, I do not reach plaintiff's contention that the court erred in refusing to instruct the jury as to adhesion contracts.