[Nos. B215812, B217658. Second Dist., Div. Six. Feb. 24, 2011.]

HARRY R. HIBBS et al., Plaintiffs and Appellants, v.
ALLSTATE INSURANCE COMPANY, Defendant and Appellant.

COUNSEL

C. William Kircher, Jr., for Plaintiffs and Appellants.

Lewis Brisbois Bisgaard & Smith, Richard B. Wolf and Gerard A. Lafond, Jr., for Defendant and Appellant.

OPINION

**GILBERT, P. J.**—An automobile insurance policy allows the insurer the option to pay for damages to an insured vehicle or to repair it. We conclude that the insurer satisfies its contractual obligation when it elects to repair, although the insured refuses to authorize the repairs.

The insurer may be liable in bad faith, however, when it pays for repairs not authorized by the insured, and then recovers from the tortfeasor in subrogation because the subrogation action may be prejudicial to the insured's direct action against the tortfeasor.

We reverse the trial court's grant of summary judgment or adjudication in favor of the insurer.

## FACTS

Harry R. and Jessica Hibbs owned a 1995 Toyota Previa van, insured by Allstate Insurance Company (Allstate). The van had been damaged in a previous accident and was repaired satisfactorily by Body Tech, an Allstate-approved repair shop. Thereafter, the Hibbs had offered the van for sale.

On April 13, 2004, the van was parked legally in front of the Hibbs's home when it was struck by a sedan driven by Jerome Brooks. Damage to the van's front end was substantial. The van was towed to Body Tech. Thomas Koch is the owner and manager of the Body Tech repair shop.

Jessica Hibbs (Jessica) called Allstate and on April 14, 2004, the day after the accident, she went to Body Tech. Koch told her that he could not give a repair estimate without her consent to "tear down" the front end of the van to determine the extent of the damage. Jessica signed a form authorizing the teardown and an authorization to repair. Each authorization is dated April 14, 2004.

The repair authorization estimated a $6,500 cost, but did not contain any details. Jessica believed the documents she signed only authorized the

teardown. Koch testified in his deposition that he believed the documents Jessica signed on April 14, 2004, authorized "[o]nly the disassembly of the vehicle to determine the damage."

After Jessica returned home from Body Tech, she called Allstate's claims adjuster, Kristi Baker. Jessica told Baker she believed the van was a total loss.

On April 22, 2004, Baker received a telephone call from Harry Hibbs (Harry), who was adamant that the van was a total loss. He stated that he would refuse to pick the vehicle up if repaired. After speaking to Harry, Baker called Body Tech. An employee told her that Jessica had authorized the repairs, which were now substantially complete.

On May 3, 2004, Body Tech sent the van to Sears for wheel alignment. After the alignment was completed, a Sears employee driving the van back to Body Tech ran into another car. Once again, the front end of the van suffered damage. The Hibbs refused to authorize repairs arising from the Sears accident, and refused to pick up the van.

Body Tech's total charge for repairs relating to the April 13, 2004, accident was $6,200.40. Allstate paid $5,700.40 directly to Body Tech. The $500 balance represented the insured's deductible. Allstate eventually recovered $6,200.40 from Brooks's insurer. Allstate sent a $500 check to the Hibbs, which they never cashed.

Body Tech sold the van at auction to satisfy its lien for the $500 deductible, storage charges and other costs. Koch was the only buyer at the lien sale.

The Hibbs filed the instant action against Allstate, alleging causes of action for conversion, breach of contract and breach of the covenant of good faith and fair dealing. Allstate moved for summary judgment and summary adjudication.

## DECLARATIONS

### Koch's Declaration in Support of Allstate's Motion

After the van arrived at Body Tech, Koch telephoned Jessica to sign authorizations for teardown and payment by Allstate. He explained he could not give an accurate estimate until the van was torn down and inspected. Jessica came to the shop on April 14, 2004, and signed the authorizations. Thereafter, Koch disassembled the van and completed a detailed estimate.

On April 15, 2004, Koch telephoned Jessica and went over the estimate, line by line. Jessica gave Koch oral authorization to proceed with the repairs. Koch then either mailed the estimate to Jessica or gave it to her personally when she came to the shop later on April 15, 2004, to retrieve an item from the van.

As soon as Koch received Jessica's permission to proceed, he immediately placed orders for parts and began the teardown. Based on Koch's experience, it would take from one to four days from April 15, 2004, for the parts to arrive. Body work and painting, except for final assembly, would have been completed by April 22, 2004. He telephoned Jessica on April 29 and told her final assembly would be completed on April 30, 2004. Koch test-drove the van on April 30, and found no problems.

On May 3, 2004, Koch sent the van to Sears for alignment. As a Sears employee was driving the van back to Body Tech, it was involved in a "minor" accident resulting in "extremely minor" front-end damage. Sears agreed to pay for the repairs.

On May 5, 2004, Koch spoke with Jessica on the telephone, and told her about the Sears accident. Jessica came to Body Tech to view the damage. She would not sign the final estimate for the April 13, 2004, accident or the authorization to repair the damage from the Sears accident. She told Koch that her husband would handle the matter.

On May 7, 2004, Koch spoke with the Allstate adjuster. Baker told him the Hibbs would not accept delivery of the van, but that Allstate would pay for the repairs. On May 10, Koch spoke on the telephone with Harry who told him they would not pick up the van.

Koch initiated a lien sale on May 14, 2004. No other person appeared at the sale, so Koch purchased the van. He later sold it to an automobile wholesaler. Koch recovered just enough to pay for his $2,000 storage charge, expenses for repair of the Sears damage, and cost of Department of Motor Vehicles registration, taxes and lien sale.

### *Claim Adjuster Baker's Declaration in Support of Allstate's Motion*

On April 14, 2004, Baker spoke with Jessica, who stated that she believed the van was a total loss. Baker replied that they would not know whether the van was repairable until the repair shop completed the teardown and estimate. She said if the van was repairable, Allstate would pay for and guarantee Body Tech's work.

On April 22, 2004, Baker received a telephone call from Harry, who was adamant that the van was a total loss. He said that the accident occurred while he was in the process of selling the van. He stated he would not pick up the vehicle, if repaired.

After Baker spoke with Harry, she called Body Tech. An employee informed her the repairs were substantially complete and that Jessica had authorized them.

On May 5, 2004, Harry left Baker a telephone message. He said the van was still in possession of the body shop, and it had been in another accident. He reiterated that it was "totaled."

Baker called Koch who told her about the Sears accident. Koch told Baker he needed a signed authorization from the Hibbs before he could make the Sears accident repairs. Baker told him that may be a problem because the Hibbs were insisting that the van be totaled. Baker assured Koch that Allstate would pay for repairs for damage sustained in the April 13, 2004, accident.

*Jessica's Declaration in Opposition to Allstate's Motion*

On April 14, 2004, the day after the accident, Jessica went to Body Tech to retrieve some items from the van. She did not go there in response to a call from Koch. When Jessica arrived, Koch told her he could not give a repair estimate without her authorization to tear down the front end. Koch told her to sign each place where there was a check mark. She signed where indicated. She did not read the "fine print." The only thing she noticed on the form was that Koch tentatively estimated the cost of repair to be $6,500. When she signed the form, she understood she was only giving Body Tech authorization to tear down the front end.

Jessica asked Koch to check the van for damage to the air bags and other mechanical and safety parts. Koch told her he was not qualified to make the inspections she wanted. She told Koch she wanted someone from Allstate to inspect the safety and mechanical systems.

After Jessica returned home from Body Tech, she spoke with Allstate's adjuster, Baker, and described the accident. Baker told her the van was most likely a total loss. She told Baker her husband is an attorney, gave her his office telephone number, and instructed her to "clear everything" with him. Baker promised to call Jessica's husband the next day.

The next day, April 15, 2004, Jessica received a call from Koch. He told her that Body Tech completed the teardown, and that Allstate had "instructed"

Body Tech to complete the work. It was Jessica's understanding that Koch was not asking her to approve the repairs. Nor did she understand that she and her husband had any say in the matter. She did not, in fact, approve any repairs.

Koch did not review the estimate with Jessica line by line, as Koch declared. He gave her the total amount for the repairs. He told her that because the amount was less than $8,000, Allstate instructed Body Tech to proceed with the repairs. Koch did not discuss the specific repairs, whether the parts to be used were from the original manufacturer, or any other details. The first time Jessica saw a written estimate was after the lawsuit was filed.

### Harry's Declaration in Opposition to Allstate's Motion

In his first conversation with Baker, Harry was emphatic that the van should be "totaled," if at all possible. Baker did not tell him that if the van could be repaired, Allstate would repair it. Instead, she told him he had the unconditional right to be paid the cost of repair.

During the conversation, Baker assured Harry that a qualified person would inspect the van's mechanical and safety equipment prior to beginning repairs. Baker further assured Harry that Allstate would not authorize repairs and that no repairs would be made without consent.

No one told Harry about Baker's subsequent call to Body Tech in which a Body Tech employee said the repairs were substantially complete and that Jessica had authorized the repairs. Harry did not learn the repairs had been substantially completed until Jessica told him Koch called to say the repairs were completed but that the van had been in another accident.

In his second conversation with Baker she admitted she did not receive a report of a safety and mechanical inspection from a qualified inspector. Harry told Baker that Allstate was prohibited from making any claims against Brooks or his insurer.

On May 10, 2004, Jessica received a letter from Brooks's insurance carrier acknowledging receipt of the Hibbs's claim. On May 17, 2004, Harry sent a letter to Baker at Allstate. The letter stated: The first time Harry talked to Baker he "made it emphatically clear that the only thing we wanted Allstate to do was total the van." Baker replied that Allstate would not total the van unless the repair cost exceeded 80 percent of its value, and that he had the "unconditional right" to accept the repair costs in lieu of the repaired van. The letter made a settlement demand for the full $10,500 market value of the van.

Harry received a letter from Allstate dated June 20, 2004, stating that Allstate had commenced the subrogation action. On July 9, 2004, Harry sent another letter informing Allstate it was not authorized to proceed with subrogation. In a letter dated August 9, 2004, Allstate advised the Hibbs that it had recovered their $500 deductible.

It was not until after the litigation began that Body Tech produced an itemized estimate of repair costs.

## Trial Court's Ruling

The trial court granted Allstate's motion for summary adjudication on the causes of action for breach of contract and breach of the covenant of good faith and fair dealing. It denied Allstate's motion for summary adjudication on the conversion cause of action. The court determined there is a triable issue of fact on whether Jessica authorized the repairs. The Hibbs then dismissed their conversion cause of action with prejudice. The trial court ruled against Allstate on its motion for costs pursuant to Code of Civil Procedure section 998.

Both parties appeal.

## DISCUSSION

### I

A party may move for summary adjudication as to one or more causes of action if the party contends the cause of action has no merit. (Code Civ. Proc., § 437c, subd. (f)(1).) The procedure is the same as that of a motion for summary judgment. (*Id.*, subd. (f)(2).)

Summary judgment is properly granted only if all papers submitted show there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) The court must draw all reasonable inferences from the evidence set forth in the papers except where such inferences are contradicted by other inferences or evidence that raises a triable issue of fact. (*Ibid.*) In examining the supporting and opposing papers, the moving party's affidavits or declarations are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. (*Szadolci v. Hollywood Park Operating Co.* (1993) 14 Cal.App.4th 16, 19 [17 Cal.Rptr.2d 356].)

The moving party has the initial burden of showing that one or more elements of a cause of action cannot be established. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) Where the moving party has carried that burden, the burden shifts to the opposing party to show a triable issue of material fact. (*Ibid.*) Our review of the trial court's grant of the motion is de novo. (*Id.* at p. 767.)

II

The first question is whether the Hibbs authorized repair of their van. The trial court found the question of authorization presents a triable issue of fact.

Business and Professions Code section 9884.9,[1] subdivision (a) provides in part: "The automotive repair dealer shall give to the customer a written estimated price for labor and parts necessary for a specific job. No work shall be done and no charges shall accrue before authorization to proceed is obtained from the customer." Subdivision (c) of the section provides: "In addition to subdivision[] (a) . . . , an automotive repair dealer, when doing auto body or collision repairs, shall provide an itemized written estimate for all parts and labor to the customer. The estimate shall describe labor and parts separately and shall identify each part, indicating whether the replacement part is new, used, rebuilt, or reconditioned. Each crash part shall be identified on the written estimate and the written estimate shall indicate whether the crash part is an original equipment manufacturer crash part or a nonoriginal equipment manufacturer aftermarket crash part."

A dealer who fails to comply with section 9884.9 may not recover under any theory. (See *Donaldson v. Abot* (1987) 194 Cal.App.3d 817, 820 [239 Cal.Rptr. 801].)

Allstate relies on the form Jessica signed at Body Tech. The form contains both a teardown authorization and a repair authorization signed by Jessica. Both authorizations bear the date April 14, 2004. Jessica and Koch each believed Jessica was only authorizing a teardown.

It is undisputed that a teardown was necessary before an accurate estimate of repair costs could be made. Koch's affidavit states he called Jessica and orally went over the estimate line by line on April 15, 2004. Thus it appears an itemized estimate was not available to Jessica until the day after she signed the authorization to repair. Any repair authorization obtained prior to an itemized estimate would be void because it would not comply with section 9884.9. Moreover, Koch declared that he went over the estimate with Jessica

---

[1] All statutory references to section 9884.9 are to the Business and Professions Code.

in a telephone call and got her oral approval. Section 9884.9, subdivision (c) requires an itemized *written* estimate prior to approval. An oral review of the estimate with a customer over the telephone does not satisfy the statute. Thus there is a triable issue of fact on the question whether the Hibbs authorized the repairs.

In Allstate's petition for rehearing, it cites for the first time California Code of Regulations, title 16, section 3353, subdivision (g).[2] The regulation is promulgated by the Department of Consumer Affairs, Bureau of Automotive Repair. The regulation provides that under "[u]nusual circumstances," the customer may approve a repair estimate by telephone. Allstate claims the regulation substantially relaxes the literal requirements of section 9884.9.

Allstate cites no authority in support of the claim that an administrative agency has the power by regulation to substantially relax the requirements of a statute. Even if a regulation can substantially relax the requirements of a statute, the regulation here applies only to unusual circumstances. There indeed may be circumstances where a customer is unwilling or unable to go to the repair shop or to wait to receive a written estimate by mail or fax. But Allstate points to no such circumstance here. It is undisputed that Jessica appeared at Body Tech in person to sign the teardown authorization. There is no suggestion in any of the declarations that she would be unavailable to review a written repair estimate. Nor does Koch's declaration indicate he made any attempt to provide Hibbs with a written estimate prior to commencing repairs. Koch declares only that he went over the estimate with Jessica on the telephone.

There are no unusual circumstances here that would warrant relaxing the requirements of section 9884.9. Moreover, in her declaration, Jessica denies that she authorized the repair over the telephone or otherwise. Thus, in any event, there is a triable issue of fact.

---

[2] California Code of Regulations, title 16, section 3353, subdivision (g) reads as follows:

"Unusual Circumstances; Authorization Required. When the customer is unable to deliver the motor vehicle to the dealer during business hours or if the motor vehicle is towed to the dealer without the customer during business hours, and the customer has requested the dealer to take possession of the motor vehicle for the purpose of repairing or estimating the cost of repairing the motor vehicle, the dealer shall not undertake the diagnosing or repairing of any malfunction of the motor vehicle for compensation unless the dealer has complied with all of the following conditions:

"(1) The dealer has prepared a work order stating the written estimated price for labor and parts, as specified in subsection (a) or (b), necessary to repair the motor vehicle; and

"(2) By telephone, fax or e-mail, the customer has been given all of the information on the work order and the customer has approved the work order; and

"(3) The customer has given oral, written or electronic authorization to the dealer to make the repairs and the dealer has documented the authorization as provided in subsection (c) and Section 9884.9 of the Business and Professions Code."

Allstate argues that by submitting a claim under the policy, the Hibbs impliedly authorized it to proceed with repairs. Allstate cites no authority in support of its argument. The Hibbs submitted a claim under the policy in the expectation that the van would be declared a total loss. That Allstate elected to repair instead, did not give it the power to proceed with the repairs without the Hibbs's consent. The Hibbs owned the van, not Allstate.

### III

The Hibbs contend the trial court erred in its determination there is no triable issue of fact on whether they were entitled to the cost of repairs.

Allstate's insurance policy states in part: "Allstate will pay for the loss in money, or may repair or replace the damaged . . . property at our option."

Allstate takes the position that once it has elected to repair, the insured's refusal to authorize repairs relieves it of its obligation under the policy. The Hibbs argue they have a right to be paid the cost of repairs if they so elect.

The parties cite no California case on point, and we have found none. There will be one now. Cases from other jurisdictions on this issue are instructive.

In *Beals v. Home Ins. Co.* (1867) 36 N.Y. 522, an insurance policy on a building gave the insurer the option to replace lost or damaged property or to repair the building. The insurer opted to repair but the insured refused to allow the repairs. The appellate court held that the insured could not recover the cost of repairs. It reasoned that when the insurer opted to repair, its insurance policy was converted to a binding contract. Under such a contract, the insured could not recover where he refuses to allow the erection of the building. (*Id.* at p. 526.)

Other more modern cases reach a different result. In *Williams v. Farm Bureau Mutual Ins. Co. of Missouri* (Mo.Ct.App. 1957) 299 S.W.2d 587, the insurer exercised its option to repair a damaged automobile. The insured refused to allow the repairs. Instead, she demanded payment of the cost. The court recognized that a rule relieving the insurer of liability where the insured refuses to allow repairs might be supported by "cold logic." (*Id.* at p. 590.) The court stated, however, that such a rule "would neither comport with our conception of substantial justice nor be consonant with the primary purpose of all insurance coverage, i.e., indemnification against loss." (*Ibid.*) The court allowed the insured to recover the amount of the lower repair bid.

Under similar circumstances, the court in *Home Mutual Ins. Co. of Iowa v. Stewart* (1940) 105 Colo. 516 [100 P.2d 159], stated "that plaintiff should be

penalized by a refusal to grant him any reparation under the policy, for which he paid a premium, would not meet with our conception of justice." (*Id.*, 100 P.2d at p. 161.)

In most cases an insurer should have no objection to paying its insured the cost of repair. But nothing in Allstate's policy gives the insured such a right. Even *Williams* concedes that relieving the insurer of its obligation under the policy is supported by "cold logic." (*Williams v. Farm Bureau Mutual Ins. Co. of Missouri, supra*, 299 S.W.2d at p. 590.) The policy clearly and unequivocally provides that Allstate has the option to repair. Where, as here, Allstate chooses the option to repair, the Hibbs's prevention of Allstate's performance excuses Allstate's obligation under the policy. (See Civ. Code, § 1511, subd. 1.)

Unlike the facts in the out-of-state cases we cited, Allstate, the insurer, has not withheld a benefit due the insured. Allstate performed as it was required under its policy. Moreover, potential problems, we hesitate to conjure up here, could arise should Allstate pay to the Hibbs the cost of the repairs, and return to them what could be an unsafe vehicle.

The Hibbs point to evidence that Baker told Harry he had the "unconditional right" to the repair costs instead of the repaired van. They do not contest that an adjuster lacks the authority to change the terms of the policy. (See *Chatton v. National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 846, 865 [13 Cal.Rptr.2d 318] [admission by insurer's employees does not establish liability under an insurance policy].) They argue, however, that as Allstate's adjuster, Baker had the authority to settle their claims by choosing to pay them instead of having the van repaired. (Citing *Seigel v. Ohio Millers' Mutual Fire Ins. Co.* (8th Cir. 1928) 29 F.2d 988, 992.)

But telling Harry he had the "unconditional right" to payment, refers to rights under the policy, not simply to a choice among options for settling his claim. Moreover, the Hibbs cite no California authority that an adjuster is irrevocably bound by her choice of methods for settling the claim absent a showing of estoppel.

## IV

The Hibbs contend the trial court erred in granting Allstate summary adjudication on the bad faith cause of action.

An insurer breaches the implied covenant of good faith and fair dealing when it unreasonably withholds policy benefits. (*Jordan v. Allstate Ins.*

*Co.* (2007) 148 Cal.App.4th 1062, 1072 [56 Cal.Rptr.3d 312].) The performance of an act specifically authorized by the policy cannot, as a matter of law, constitute bad faith. (*New Hampshire Ins. Co. v. Ridout Roofing Co.* (1998) 68 Cal.App.4th 495, 504–505 [80 Cal.Rptr.2d 286].)

The Hibbs argue Allstate acted in bad faith when it authorized the repairs. But they cite no authority that authorizing the repairs constitutes bad faith. Any authorization by Allstate would be subject to further authorization by the Hibbs under section 9884.9. That Body Tech may have proceeded without the Hibbs's authorization, does not show Allstate's bad faith.

The Hibbs argue Allstate breached the covenant of good faith by ignoring their requests for a mechanical and safety inspection to ensure the van was safe. But the Hibbs point to nothing in the policy that obligated Allstate to conduct the expert inspections they were demanding. Nor can they show that the van was not, in fact, repaired to a safe condition. It is undisputed that Allstate was willing to guarantee the repairs.

The Hibbs argue Allstate failed to respond to Harry's letter of May 17, 2004, in which he made a settlement demand. But the demand was for the full market value of the van. Allstate was under no obligation to pay the full market value. (See *Ray v. Farmers Ins. Exchange* (1988) 200 Cal.App.3d 1411, 1417–1418 [246 Cal.Rptr. 593].)

■ Finally, there is however a triable issue of fact concerning Allstate's good faith in prosecuting its subrogation claim. Assuming the Hibbs did not consent to the repairs, Body Tech was not due any compensation. (See *Donaldson v. Abot, supra*, 194 Cal.App.3d at p. 820.) Thus the payment Allstate made to Body Tech was voluntary. To have a right to subrogation, the subrogee must not have acted as a volunteer. (*American Contractors Indemnity Co. v. Saladino* (2004) 115 Cal.App.4th 1262, 1268 [9 Cal.Rptr.3d 835].) Thus Allstate had no right to subrogation. Prior to settling with Brooks's insurer, Allstate knew the Hibbs were claiming they had not consented to the repairs, and had warned Allstate not to proceed with subrogation.

Allstate claims the Hibbs were not prejudiced by its subrogation action. It professes not to know why the Hibbs did not sue Brooks for all their losses, including any stigma damages. But Allstate concedes that Brooks would have a setoff for any amounts paid to Allstate in subrogation. However one analyzes it, Brooks's right to a setoff would be a detriment to the Hibbs in any cause of action they might bring against Brooks. The Hibbs were prejudiced by Allstate's subrogation action. There is a triable issue of fact on whether Allstate breached its covenant of good faith.

We reverse and remand for trial on the issue of bad faith. We need not consider Allstate's appeal of the trial court's ruling under Code of Civil Procedure section 998. Costs on appeal are awarded to the Hibbs.

Coffee, J., and Perren, J., concurred.

A petition for a rehearing was denied March 24, 2011, and the opinion was modified to read as printed above.