[No. G031069. Fourth Dist., Div. Three. June 25, 2004.]

REMIGIO LEBRILLA et al., Plaintiffs and Appellants, v. FARMERS GROUP, INC., et al., Defendants and Respondents.

## COUNSEL

Milberg Weiss Bershad Hynes & Lerach, John J. Stoia, Jr., William S. Dato, Timothy G. Blood and Kevin K. Green for Plaintiffs and Appellants.

Skadden, Arps, Slate, Meagher & Flom, Raoul D. Kennedy, Sheryl C. Medeiros and Janet Dhillon for Defendants and Respondents.

## OPINION

**O'LEARY, J.**—Remigio and Lina Lebrilla, and Karen and Paul Balfour (collectively the Lebrillas) sought statewide class certification in their suit against Farmers Group, Inc., doing business as Farmers Underwriters Association, and Farmers Insurance Exchange (collectively Farmers), regarding Farmers' car repair practices. The trial court denied the Lebrillas' motion seeking class certification, ruling the lawsuit did not involve predominant common questions of law or fact. On appeal, the Lebrillas argue the court's ruling was based on a premature assessment of the lawsuit's underlying merits. We conclude the matter must be reversed because the court applied the wrong legal criteria.

I

Farmers provides automobile insurance to California consumers. Under the terms of its standardized insurance policy, Farmers limits their liability as follows: "Our limits of liability for loss shall not exceed: (1) The amount which it would cost to repair or replace damaged or stolen property with other of like kind and quality; or with new property less an adjustment for physical deterioration and/or depreciation."

According to the Lebrillas, Farmers has a "company wide policy to use parts not manufactured by the original equipment manufacturer [OEM], but knock-offs or imitations of the OEM parts made by manufacturers who do

not have the material or dimensional and manufacturing specifications of the original equipment manufacturer. These knock-offs are commonly called aftermarket parts, non-OEM parts, or imitation parts. Farmers specifies these imitation parts because they are cheaper than OEM parts."

This case involves a narrow subset of non-OEM parts, known as "crash parts" or mass-produced "sheet-metal" parts such as hoods and fenders.[1] The Lebrillas assert these crash parts are "inferior to OEM parts in terms of structural integrity, corrosion resistance, finish and appearance, fit, material composition, durability, and dent resistance; and therefore are not of like kind and quality to OEM parts as required by Farmers' insurance policy."

The Lebrillas filed a lawsuit on behalf of themselves, and others similarly situated, challenging Farmers' "practice of installing imitation crash parts on its insureds' vehicles or paying its insureds' money based on the cost of imitation crash parts."[2] The Lebrillas assert, "As a result of Farmers' deceptive and fraudulent actions, plaintiffs and the class received substandard repair work which failed to restore their damaged vehicles to pre-loss condition and received imitation crash parts on their vehicles or received payments that were insufficient because they were based on cheaper, inferior parts and omitted repairs."

They sought statewide class certification of three causes of action: declaratory and injunctive relieve; violation of the unfair competition law (UCL) (Bus. & Prof. Code, § 17200, et seq.); and violation of the Consumers Legal Remedies Act (CLRA) (Civ. Code, § 1750, et seq.).[3] The complaint framed several potential remedies available to the court, including an injunction directing Farmers to comply with the "like kind and quality standard" and restitution measured by the amount Farmers has saved since June 1996 (the class period) using inferior cheaper parts.

The trial court denied the motion seeking class certification stating, "The number of unique factual issues relating to each class member strikes me as being dominant and as destroying any benefit that we could possibly get from

---

[1] This case concerns 14 specific crash parts: "bumper reinforcements and absorbers, hoods, fenders, door shells, quarter panels, rear outer panels, deck and trunk lids, truck beds and box sides, body side panels, tailgates and lift gates."

[2] Specifically, the proposed class was defined as: "All persons who, from June 15, 1996 to present, (1) were insured by a private passenger automobile insurance policy issued in California by Farmers, (2) made a first party claim for vehicle repairs pursuant to their policy, and (3) either had one or more of the following imitation parts installed on their vehicle or were paid cash by Farmers where the amount of payment was based in part on the cost of such parts: [list of 14 crash parts discussed, *ante* fn. 1]."

[3] The Lebrillas' complaint also states causes of action for breach of contract, false and misleading advertising, deceit, insurance bad faith, and fraudulent concealment.

class treatment. I cannot in my mind . . . conclude that this is an appropriate case for class treatment on a class that you have identified for this action. [¶] The reasons are, I think, well stated in some of the opposition. . . . [¶] . . . I cannot conceive, in my analysis of the situation, of grouping all of these claims for class treatment when my impression is they will almost, of necessity, require individualized analysis. Each part, each claim, each car, and probably each discussion, each agreement between repair agent and customer and claims rep[resentative], leaves, to me, too many issues that are unique and individual to permit class treatment."

## II

### GENERAL LAW REGARDING CLASS CERTIFICATION

"Courts long have acknowledged the importance of class actions as a means to prevent a failure of justice in our judicial system. [Citations.] ' "By establishing a technique whereby the claims of many individuals can be resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress . . . ." ' [Citation.] Generally, a class suit is appropriate 'when numerous parties suffer injury of insufficient size to warrant individual action and when denial of class relief would result in unjust advantage to the wrongdoer.' [Citations.] But because group action also has the potential to create injustice, trial courts are required to ' "carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." ' [Citations.]" (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 434–435 [97 Cal.Rptr.2d 179, 2 P.3d 27] (*Linder*).)

Code of Civil Procedure section 382 authorizes class suits in California when " 'the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court.' To obtain certification, a party must establish the existence of both an ascertainable class and a well-defined community of interest among the class members. [Citations.] The community of interest requirement involves three factors: '(1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.' [Citation.] Other relevant considerations include the probability that each class member will come forward ultimately to prove his or her separate claim to a portion of the total recovery and whether the class approach would actually serve to deter and redress alleged wrongdoing. [Citation.]" (*Linder, supra,* 23 Cal.4th at p. 435.)

We are mindful that "[b]ecause trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification. The denial of certification to an entire class is an appealable order [citations], but in the absence of other error, a trial court ruling supported by substantial evidence generally will not be disturbed 'unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made [citation].' [Citation.] Under this standard, an order based upon improper criteria or incorrect assumptions calls for reversal ' "even though there may be substantial evidence to support the court's order." ' [Citations.] Accordingly, we must examine the trial court's reasons for denying class certification. 'Any valid pertinent reason stated will be sufficient to uphold the order.' [Citation.]" (*Linder, supra,* 23 Cal.4th at pp. 435–436.)

### CLASS CAN ESTABLISH PREDOMINANT COMMON QUESTIONS OF FACT AND LAW

In this case, the trial court concluded the claims could not be grouped for class treatment because there were a "number of unique factual issues relating to each class member." In other words, the court was convinced there were no predominant questions of fact and law, and the class members' claims were not susceptible to common proof.

In their motion, the Lebrillas claimed the following common questions of law and fact make their claims "ideally suited for class treatment . . .": (1) Each of the California insurance policies is identical and, therefore, a declaration of the insureds' rights under the policy presents a common classwide issue; (2) Whether Farmers' common practice of specifying imitation crash parts meets the "like kind and quality" standard in the policy presents a common classwide issue; (3) Each class member's vehicle was repaired using imitation parts or each member was paid cash by Farmers based in part on the cost of such parts; and (4) " [T]he injunction sought—requiring Farmers to retrospectively and prospectively comply with its coverage obligations—is the very type of classwide injunction that is ideal for certification."

The Lebrillas discussed the common evidence they have gathered to prove the class claims. For example, they asserted the fact Farmers' "imitation parts are categorically inferior to OEM parts" could be proved on a classwide basis since they all suffer from the same design, manufacturing, and testing defects.

As explained by the Lebrillas' expert, Paul Griglio, "Crash parts are produced through a manufacturing process. They are not handmade individual items, rather they are uniformly produced through the use of particular tools,

processes, specifications, and materials. Analysis of each part is not necessary to determine the relative quality of a part . . . . Modern automotive manufacturing, first introduced by Henry Ford, has obviated the need for individual assessment of the quality of any one individual part." He concluded, "[N]o vehicle that has OEM crash parts replaced with non-OEM crash parts is restored to its pre-loss condition and no individual evaluation or assessment of the vehicle would be necessary in order to make this determination." (Boldface omitted.)

The Lebrillas' expert cited three critical and consistent distinctions between OEM and non-OEM parts. Griglio explained all OEM parts are made to specifications both in terms of materials and in terms of dimensions. These specifications are proprietary and not available to non-OEM manufacturers. He opined that without this information, manufacturers cannot produce a part identical to an OEM part. Second, Griglio noted all OEM manufacturers engage in large-scale production of parts, which ensures uniform characteristics. He stated, the small production runs used by manufacturers of non-OEM parts lack the safeguards inherent in large-scale production, such as specialized machinery and precise dies, molds, and stampings. Finally, Griglio focused on the fact all OEM parts are crash and durability tested. He stated that because OEM manufacturing standards result in the production of virtually identical parts consumers can be assured that the performance of replacement OEM parts will be equal to the performance of original OEM parts. He opined that no similar assurances can be made by non-OEM manufacturers. For these reasons, the Lebrillas contend common proof can show non-OEM parts are *universally* inferior to OEM parts.

Farmers presented nine reasons why the proposed class claims do not present common questions of law and fact.[4] Most of the arguments are premised on Farmers' different interpretation of "like kind and quality." It maintained the phrase is tied to the preaccident condition (age, use and condition) of each class member's car and, therefore, not subject to common proof.

As noted by both parties on appeal, interpretation of "like kind and quality" is by no means settled. Class actions challenging the use of

---

[4] In its opposition, Farmers argued: (1) a majority of courts across the country have refused to certify non-OEM parts cases finding the claims not susceptible to common proof; (2) Farmers does not have a common practice regarding non-OEM parts but rather relies on the skill and experience of body shops; (3) plaintiffs' theory that all non-OEM parts are inferior is legally untenable; (4) any recovery would require a de facto repeal of Business and Professions Code section 9875, subdivision (b); (5) plaintiffs' expert does not provide competent support for the theory all non-OEM part are inferior; (6) the limited authority supporting class certification is an aberration; (7) the class cannot state a common cause of action under the Unfair Practices Act or CLRA; (8) the issue of damages is difficult to calculate and is not common; and (9) an injunction may only issue to prevent future harm and not remedy past wrongs.

non-OEM crash parts have been popping up all over the United States, and from this body of litigation two different interpretations have emerged. Contrary to the Lebrillas' contention, interpretation of the policy language at this stage of the proceedings is not premature. As aptly stated by Farmers, "While the trial court *may not* determine whether or not the claim has merit, it *must* determine the applicable legal standard, in order to analyze whether appellants can demonstrate an ability to satisfy that legal standard by common proof."

THE NATIONWIDE DEBATE

The question of whether a class can establish imitation crash parts are *uniformly* not of like kind and quality as OEM parts has been examined by nearly one dozen out-of-state courts, but is an issue of first impression in California. When the trial court considered the issue, Farmers argued in its opposition, "This is at least the eleventh court, in the seventh state, that has been asked to certify a class in a non-OEM parts case. All but two of these courts—both in Illinois—have refused to grant certification."

Much of the out-of-state authority relied on by the parties is unpublished. In California an unpublished opinion may not be cited or relied upon. (Cal. Rules of Court, rule 977(a); *People v. Webster* (1991) 54 Cal.3d 411, fn. 4 [285 Cal.Rptr. 31, 814 P.2d 1273].) However this rule applies only to opinions originating in California. Opinions from other jurisdictions can be cited without regard to their publication status. Decisions of the courts of other states are only regarded as "persuasive . . . depending on the point involved" (9 Witkin, California Procedure (4th ed. 1997) Appeal, § 940, p. 980), and some states have different publication criteria than California.

At the time the motion was argued before the trial court, the Illinois appellate court had published its decision. (*Avery v. State Farm Mutual Automobile Ins. Co.* (2001) 321 Ill.App.3d 269 [746 N.E.2d 1242, 254 Ill.Dec. 194] (*Avery*) [depublished].) Farmers argued the opinion was an "aberration" and urged the trial court to consider the unpublished opinions from six other states—Florida, Tennessee, Alabama, Washington, Maryland, and Texas. Since then, four more states have weighed in on the debate, and Florida has switched sides,[5] forming an alliance with Illinois, Pennsylvania, and Mississippi. Massachusetts and Ohio joined the group denying class certification.

---

[5] The Florida District Court of Appeal reversed the trial court's decision in *Thames v. United Services Automobile Assn.* (Fla. Cir. Ct., June 9, 2001) No. 98-01324 CA DIV. CV-B [unpub. opn.].) The analysis of *Thames* was emulated in the unpublished opinions from Tennessee, Washington, and Maryland.

We start our discussion with the highly persuasive body of case authority authorizing class certification. Although the Illinois *Avery* opinion was ultimately depublished, two other states (Missouri and Florida) have published comparable opinions on the matter. (*State ex rel. America Family Mutual Ins. Co. v. Clark* (Mo. 2003) 106 S.W.3d 483 (*Clark*); *Sweeney v. Integon General Insurance Corp.* (Fla. 2002) 806 So.2d 605 (*Sweeney*); *United Services Automobile Assn. v. Modregon* (Fla. 2002) 818 So.2d 562 (*Modregon*). And, the Pennsylvania court prepared an extremely detailed analysis of the issue in *Foultz v. Erie Ins. Exchange* (Pa.Ct.Common Pleas Mar. 13, 2002 No. 3053) 2002 WL 452115 (*Foultz*).)[6]

In *Clark*, the plaintiffs sued their car insurance company for breach of contract on behalf of themselves and similarly situated plaintiffs nationwide. (*Clark, supra,* 106 S.W.3d at p. 484.) The Supreme Court of Missouri determined the laws of 14 states applicable to the proposed class action were too varied to support a nationwide class action. It reasoned Missouri had no interest in applying the "kaleidoscope of rules" and insurance laws found in the other states to Missouri citizens and thus concluded the trial court "abused its discretion in certification of the class with respect to insureds whose contracts [were] subject to the laws of states other than Missouri." (*Id.* at p. 487.)

However, the *Clark* court upheld the court's certification of a class action for insureds whose policies are subject to Missouri law. (*Clark, supra,* 106 S.W.3d at pp. 488–489.) Like Farmers, the insurance company in *Clark* argued individual inquiries were necessary to decide whether (1) the damaged parts at issue for all class members were OEM parts in good condition, and (2) all the non-OEM crash parts used for repair were inferior to OEM crash parts. The court disagreed stating, "Under plaintiffs' theory, [the insurance company] breached its contract[] with each prospective class member when it made payment on policyholders' claims based upon estimates either specifying the use of non-OEM crash parts or omitting particular repairs. This common issue is the predominant issue. If it is established at trial that [the insurance company] did not breach its contracts . . . then the claims of all the prospective class members fail without further factual analysis. If it is determined that [the insurance company actions constitute a breach of contract] . . . for some or all of the prospective class members, then the trial court can proceed in the most expeditious and efficient way possible relative to any individual circumstances or issues that may exist. The predominance

---

[6] There is also one unpublished case from the Pennsylvania Court of Common Pleas permitting joinder of the non-OEM manufacturers to the *Foultz* class action. (*Greiner v. Erie Insurance Exchange* (2001) 57 Pa. D & C.4th 312.)

We note the Illinois Supreme Court did not reverse the appellate court's decision in *Avery*. The jury verdict entered against the insurance company remains intact.

of the common issue is not defeated simply because 'individual questions may remain after interpretation of the contract—questions of damages or possible defenses to individual claims.' [Citations.]" (*Ibid.*)

The *Clark* court acknowledged that other state courts faced with similar facts have reached contrary conclusions. It gave as an example an unpublished Ohio case, *Augustus v. Progressive Corp.* (2003) 2003 Ohio 296, in which the court affirmed the lower court's decision to deny class certification. The *Clark* court reasoned, "While the court in *Augustus* found that 'it would be inconceivable to reason that an automobile is not returned to its "pre-loss condition" because a non-OEM part is utilized in making a repair[,'] we leave the determination of that predominant issue in this case to the trier of fact." (*Clark, supra,* 106 S.W.3d at p. 489, fn. 7.) It reiterated, "[T]he trial court can resolve individual questions, particularly those relating to damages and defenses, after making a determination on the predominant issue." (*Ibid.*)

Two Florida appellate courts have published opinions supporting class certification, and like the Missouri court, found the predominant issue in the case subject to common proof. For example, in *Sweeney,* the complaint was filed as a class action seeking damages for breach of contract based on the insurance company's policy of authorizing non-OEM crash parts to be used in vehicle repairs. (*Sweeney, supra,* 806 So.2d at p. 605.) The court reversed the trial court's dismissal of the action, explaining, the trial court ruled the plaintiff could not " 'possibly establish' the truth of its allegation that non-OEM parts uniformly are not of like kind and quality to OEM parts. Although superficially a reasonable assumption, the court is impermissibly assuming a lack of proof as to the merits of the claims. [Citation.] In reviewing a motion to dismiss a complaint, however, the trial court is limited to considering questions of law. The court is not free to rely on its assumptions as to what may, or may not, ultimately be proved." (*Id.* at p. 606.)

The *Modregon* case involved a class action filed against a different car insurance company but raised similar allegations as the *Sweeney* class action. (*Modregon, supra,* 818 So.2d 562.) In *Modregon,* the court, from a different district, upheld the trial court's denial of the insurer's motion to dismiss and motion to compel an appraisal. (*Ibid.*) In a very short opinion, the court reasoned, "The trial court denied the motion [to compel an appraisal], holding that 'the gravamen of [the] complaint challenges a policy decision by Defendant to use non-OEM parts, not the relative value of the damage to Plaintiff's vehicle' and that 'whether non-OEM parts are parts of "like kind and quality" is not an appropriate issue for an appraiser to determine.' We have reviewed the class action complaint and agree that it states more than a disagreement over the amount of loss for the Modregons' vehicle." (*Id.* at

p. 563.) Implicit in this ruling is the acknowledgment the class will have to establish the crash parts are uniformly not of "like kind and quality" as OEM parts. (*Ibid.*)

The Pennsylvania court's opinion offers a detailed analysis of the issue. (*Foultz, supra*, 2002 WL 452115.) The facts of the *Foultz* case are remarkably similar to ours. The *Foultz* plaintiff obtained car insurance with Erie Insurance Exchange (Erie), who imposed a similar limitation of liability to parts of "like kind and quality." (*Id.* at *1) The class action was limited to persons with cars repaired or valued by the replacement non-OEM crash parts. The class action suit alleged breach of the policy, violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL), and insurance bad faith. (*Ibid.*) The case differs from ours only in that the *Foultz* class dismissed its claim for declaratory relief or a permanent injunction. (*Ibid.*)

As aptly noted by the *Foultz* court, "The question as to whether the quality of non-OEM parts can be addressed on a class-wide level shapes up as a battle of decisions of out-of-state courts." (*Foultz, supra*, 2002 WL 452115 at *4.) After discussing the current status of the debate, the court sided with those courts authorizing class certification. It reasoned, "While reserving judgment as to whether the Plaintiff's claims can be corroborated, the Court is inclined to agree with the Plaintiff that the question of OEM parts and the Contested Crash Parts' uniformity does not preclude class certification. For the Court to involve itself at this stage in determining which Party's experts are correct would be to improperly address the merits of the Plaintiff's claim, at least in part. [Citation.] Moreover, the Plaintiff's expert's declaration presents a logical argument as to why non-OEM parts may be addressed in a blanket fashion. As such, the Plaintiff's claim that she can establish the value of OEM parts in relation to the value of the corresponding Contested Crash Parts on a class-wide scale supports certification." (*Id.* at * 5.)

The *Foultz* court next stated, "As an aside, it is worth noting what the Court believes the Plaintiff would be *unable* to show at trial. It is implausible that the Plaintiff could show the value of each pre-repair OEM part in Class Members' vehicles or the difference in value between such parts and the Contested Crash Parts on a class-wide basis. To establish either the value or the related difference in value would appear to require an examination of the individual parts in each Class Member's vehicle and would be a substantial obstacle to showing common questions of law and fact. Although this conclusion has no impact on whether the Plaintiff can establish generalized values of Contested Crash Parts and OEM parts, which the Court has concluded is plausible, it has potential implications for the Plaintiff's ability to show damages on a class-wide basis, as seen *infra*." (*Foultz, supra*, 2002 WL 452115 at *5.)

The *Foultz* court considered what values are necessary to establish damages on a classwide basis and particularly whether a classwide difference in kind and quality can be shown. It reasoned, "As discussed *supra*, value generalizations involving the Contested Crash Parts and OEM parts are possible, while value generalizations involving used OEM parts are not. Thus, if 'like kind and quality' includes distinctions based on the age, condition and use of the part being replaced, resolving the Class's claims will require the Court to confront individual questions, and the commonality element will not be satisfied. On the other hand, if 'like kind and quality' refers only to the design and material of the part replaced, valuation questions may be addressed on a class-wide scale, and the condition of each Class Member's used OEM part will be irrelevant. The Court therefore must examine the definition of 'like kind and quality' under the Policy." (*Foultz, supra,* 2002 WL 452115 at *6.)

 In Pennsylvania, as in California, interpretation of an insurance policy is a matter of law to be decided by the court. (*Foultz, supra,* 2002 WL 452115 at *6; *Ray v. Farmers Ins. Exchange* (1988) 200 Cal.App.3d 1411, 1415 [246 Cal.Rptr. 593] (*Ray*).) The *Foultz* court explained some courts addressing the term "like kind and quality" discuss the "term broadly and provide little guidance as to what the term's underlying meaning is. Frequently, courts have stated that a 'like kind and quality' replacement provision requires the insurer 'to put the automobile in as good condition as it was before the collision' without reaching a conclusion as to whether age and use should be factors in determining the condition or whether an examination is limited to the suitability and material of the parts in question. [Citations.]" (*Foultz, supra,* 2002 WL 452115 at *6.) Coincidentally, the *Foultz* court gives as an example the very same California case Farmers believes is dispositive.

In *Ray, supra,* 200 Cal.App.3d at page 1416, the jury concluded Farmers did not breach its insurance policy contract by failing to compensate the plaintiff, after repair of his wrecked car, for the car's diminution in market value because of its status as a wrecked car. The appellate court affirmed the judgment finding Farmers did not have a duty to repair the automobile both to its preaccident condition and market value. It explained the insurance policy has a provision giving "Farmers the right to elect to repair Ray's vehicle if the cost to repair to 'like kind and quality' was less than the actual cash value of the vehicle at the time of the loss." (*Id.* at p. 1416.)

The *Ray* court examined *Owens v. Pyeatt* (1967) 248 Cal.App.2d 840 [57 Cal.Rptr. 100], the only other California case interpreting the phrase "like kind and quality." It noted the *Ownes* court determined, " 'The type and extent of repair contemplated by this provision were such as would place the automobile in substantially the same condition it was before the accident. . . .

If the damage was such [that] the automobile could not be restored to this condition [the insurer] was required to pay the actual cash value thereof at the time of loss.' " (*Ray, supra,* 200 Cal.App.3d at pp. 1416–1417.) Based on this definition, the *Ray* court reasoned "like kind and quality" could not be the equivalent of "actual cash value" as suggested by the plaintiff. Rather, it concluded the provision simply required Farmers to repair the plaintiff's car to "its preaccident safe, mechanical, and cosmetic condition . . . ." (*Id.* at p. 1418.)

■ We agree with the *Foultz* court that *Ray* provides little guidance as to the precise definition of preloss condition. The opinion does not specify whether age, use, or condition should be factors. We are unpersuaded by Farmers's contention the case is dispositive. Rather, we are convinced, as was the *Foultz* court, by the out-of state authority holding "that 'like kind and quality' refers only to a part's material and suitability, not its age or extent of use." (*Foultz, supra,* 2002 WL 452115 at *7.)

The court in *Foultz* went on to explain that in *Maryland Motor Car Ins. Co. v. Smith* (Tex.Civ.App. 1926) 254 S.W. 526, "for example, the plaintiff brought suit against her automobile insurer to recover the amount that it would have cost to repair her vehicle with [like kind and quality] parts. In affirming the trial verdict in favor of the plaintiff, the Texas Appellate Court found that '[t]he words "of like kind and quality" do not refer to parts of like age, use, and condition, or present cash value or the parts injured or destroyed by the fire. The words are used as relating to quality and suitableness or fitness for the purposes used.' [Citation.] [¶] Similarly, *North River Insurance Co. v. Godley* [(Ga.Ct.App.1936)] 189 S.E. 577 . . . revolved around a plaintiff's attempt to recover for damages to his roof under an insurance policy *that allowed recovery up to the cost to repair the property with* 'material of like kind and quality.' To define this term, the Georgia Court of Appeals held that 'the expression "material of like kind and quality" refers to the kind and quality used in the original construction. There is no plea and no contention that the roof could have been repaired by using old shingles.' [Citation.] On a related note, the Florida District Court in *Siegle v. Progressive Consumers Ins. Co.* [(Fla.Dist.Ct.App.2001)] 788 So.2d 355 . . . looked at the relationship between "like kind and quality" and market value: A repair with like kind and quality would thus require the property to be restored to good condition with parts, equipment and workmanship of the *same essential character, nature and degree of excellence which existed on the vehicle prior to the accident.* The damaged vehicle may or may not be returned to its pre-accident market value, but a return to market value is not what the words 'repair' with 'like kind and quality' commonly connote and is not what an ordinary insured would reasonably understand the phrase to mean. The psychology of the market place, which assigns a lesser value to an adequately and competently repaired vehicle, has nothing to do with the

'quality' of the repair itself. [Citation.]" (*Foultz, supra,* 2002 WL 452115 at *7.) In short, many out-of-state courts have similarly concluded the words "kind and quality" relate to "suitableness of fitness for the purpose intended." (*Ibid.*)

On a final note, the *Foultz* court commented, "Another indication that age is irrelevant to a part's kind and quality is the fact that many courts have held that depreciation, which accounts in part of the age of and wear-and-tear on a specific item, cannot be considered as a factor when calculating the costs of repairs based on parts of 'like kind and quality.' (*Foultz, supra,* 2002 WL 452115 at *8.) Depreciation is usually considered only when an insurer elects to pay the "actual cash value" of the damaged property. By electing to repair or replace, the insurer "elected a measure of loss that does not allow for depreciation. [Citation.]" (*Ibid.*) Indeed, under Farmers' policy in this case, an alternative to replacing the damaged part is to pay for "new property less an adjustment for physical deterioration and/or depreciation."

The insurance company in *Foultz* admitted its appraisers do not record or describe the preaccident condition of the vehicle or its parts. According to the company's vice-president, a car with a dented door that is further damaged in a collision will be replaced with an undamaged door (even if another dented door could be located). Thus, very telling was the insurance companies own application of the term. It was understood a rusty fender damaged in a collision would not be replaced with a different rusty fender. (*Foultz, supra,* 2002 WL 452115 at *9.)

Based on the above "case law and respected authorities" the *Foultz* court concluded, "[T]he age and use of an individual Class Member's OEM parts is not pertinent to determining whether the replacement parts are of 'like kind and quality.' Rather, 'like kind and quality' centers on the original parts' OEM status alone, and an analysis may focus on the quality of OEM parts and Contested Crash Parts in general. As such, contingent on her ability to substantiate her generalizations as to the quality of OEM parts and the Contested Crash Parts, the plaintiff will be able to establish damages and the value of such damages on a class-wide basis. [Citation.]" (*Foultz, supra,* 2002 WL 452115 *9.) We agree and adopt this sound analysis and reasoning.

That being said, we obviously were not won over by the decisions of our sister states denying class certification. Suffice it to say, the state courts rejecting class certification uniformly interpret "like kind and quality" as being tied to the preloss condition of each vehicle.[7] In nearly every instance,

---

[7] We note several sister states credited by Farmers as denying class certification, never directly addressed the issue now before us. For example, from Washington came the case *Schwendeman v. USAA Casualty Insurance Co.* (2003) 116 Wn.App. 9 [65 P.3d 1]—but it is

there is a noticeable sense of disbelief at the notion imitation parts *can never* be of "like kind and quality" to OEM parts.[8] And, it should be noted, several of the decisions were handed down before *Avery, Foultz,* and their progeny. For the reasons stated above, we interpret "like kind and quality" differently and do not wish to speculate on whether plaintiffs will be able to prove their case.

■ Indeed, it remains to be seen whether the trier of fact will be persuaded by the plaintiffs' common proof and experts' testimony as to the quality of OEM parts and the imitation crash parts. However, we are certain that, at this time, it is not our role, nor the trial court's job, to involve ourselves with the merits of the underlying action or which parties' experts are most qualified. The Lebrillas' expert's lengthy declaration (10 pages) presents several reasoned and plausible explanations as to why non-OEM parts can be discussed with common evidence and in a blanket fashion. He is the designated expert in numerous other out-of-state class actions involving non-OEM crash parts, including *Avery* and *Foultz.* Farmers' contention the expert's opinion is flawed is an argument best left for trial. As decided by our Supreme Court, "[W]e view the question of certification as essentially a procedural one that does not ask whether an action is legally or factually meritorious." (*Linder, supra,* 23 Cal.4th at pp. 439–440.)

### III

#### OTHER ARGUMENTS TO CLASS CERTIFICATION ARE WITHOUT MERIT

On appeal, Farmers raises several arguments not mentioned by the trial court when making its ruling. We will briefly explain why we find these arguments meritless.

---

inapt because, unlike the insurance policy in our case, the USAA insurance policy qualified the phrase "like kind and quality" to specifically include analysis of each vehicle's age, use, and condition. The court's analysis centers on interpretation of a totally different policy provision and thus is of no value to our case. The case from Massachusetts, *Roth v. AMICA Mutual Ins. Co.* (2003) 440 Mass. 1013 [796 N.E.2d 1281] is hardly worth mentioning because denial was based on the fact the motion was untimely filed. (*Id.* at p. 1283.) And, the one published case from Texas interpreting the phrase "like kind and quality" was rendered in the context of reviewing a summary judgment (entered in favor of the insurer). (*Berry v. State Farm Mutual Automobile Ins. Co.* (Tex. 2000) 9 S.W.3d 884.) The court did not consider the merits of certifying the class.

[8] As boldly stated by one trial court, "[T]his court is of the belief that such a proposition cannot be proven given that this country's free market economy relies heavily on the ability to manufacture and sell non-original or imitations items, i.e., generic drugs." (*Herrera v. United Automobile Ins.* (Fla. Cir. Ct. Dec. 12, 2002) No. 001540CA25 [nonpub. opn.].) This statement was an advisory opinion—the court had already determined the plaintiff lacked standing to represent the class because her car was repaired using OEM parts and, therefore, she would not be entitled to damages.

The California Code of Regulations

Title 10, section 2695.8, subdivision (j) of the California Code of Regulations provides, "No insurer shall require the use of non-original equipment manufacture replacement crash parts in the repair of an automobile unless: [¶] (1) the parts are at least equal to the original equipment manufacturer parts in terms of kind, quality, safety, fit and performance . . . ."

Farmers asserts the statute does not apply to it because it does not require the use of non-OEM parts. Alternatively, Farmers points out the provision fails to expressly prohibit the use of non-OEM parts, and therefore, the Legislature impliedly determined "at least some non-OEM parts" are of "like kind and quality" to OEM parts.[9] Farmers fails to appreciate the Lebrillas are not objecting to the use of every non-OEM part, only a narrow subset of "crash parts" which they claim are uniformly inferior. According to the Lebrillas, interpretation of the phrase "like kind and quality" can be based entirely on the statute. The Lebrillas assert they have common proof the imitation parts at issue are not equal to the OEM parts "in terms of kind, quality, safety, fit and performance." (Cal. Code Regs., tit. 10, § 2695.8, subd. (j)(1).)

The legislative requirement that insurers use replacement parts of like "kind, quality, safety, fit and performance" to OEM parts suggests to us the Legislature is well aware there have been problems with some non-OEM parts. Indeed, as noted by Farmers, one year after the Lebrillas filed their lawsuit, the Legislature enacted Senate Bill No. 1178, authorizing a study to "consider the appropriate criteria or standards [necessary] for certifying crash parts" and to identify an oversight agency for certifying non-OEM parts. (Assem. Com. on Business and Professions, staff com. on Sen. Bill No. 1178, as amended April 26, 2001 (July 10, 2001).) As noted by the committee authoring the bill, "There recently has been a rash of class action litigation regarding the use of non-OEM parts" and a dramatic increase in the price of OEM parts, resulting "in a virtual monopoly for OEM parts manufacturers." (*Ibid.*) The committee commented insurance rates "are on the rise at a more rapid rate than they might otherwise be if insurance companies felt more confident using non-OEM parts." (*Ibid.*) Clearly, the Legislature and insurance companies are aware that not all inferior non-OEM parts have been eliminated. Thus, we reject Farmers's suggestion it can be inferred the Legislature in passing California Code of Regulations, title 10, section 2695.8, subdivision (j), impliedly determined "crash parts" are not inferior.

---

[9] Farmers' argument that the regulation is inapt because there is no proof it has a policy *requiring* the use of non-OEM parts cannot serve to deny certification. As noted above, neither we, nor the trial court, can or will consider the merits of the underlying action in determining whether the class should be certified.

CRITICISMS OF PROPOSED DECLARATORY AND INJUNCTIVE RELIEF

Farmers contends the Lebrillas' "proposed declaratory relief failed to eliminate the inherently individualized issues that permeated all of their causes of action." Specifically, it claims "a declaration 'interpreting' the insurance policies would need to be coupled with some form of 'retroactive analysis of the repair jobs that have occurred' and thus each class member will have to establish an individualized assessment of each car, each part, each repair." It adds, the Lebrillas cannot show substantial benefits would accrue from class treatment. Farmers misunderstand the type of relief the class is requesting.

As the Lebrillas explain on appeal, "The onus of complying with the policy as judicially construed falls on Farmers. There will be no analysis for the court to do. Under plaintiffs' proposed injunction, Farmers will be ordered to adjust its insureds' claims in accordance with [the] judicially declared meaning of the 'like kind and quality' provision. It will be left to Farmers to adjust insurance claims in accordance with claims procedures already in place . . . [and] it will be up to Farmers to ensure that each class member receives the coverage required under the policy. [¶] These obligations are fairly paced on Farmers because adjusting claims is squarely within Farmers' expertise."

The Lebrillas maintain a similar injunction was approved in *State Farm Mutual Automobile Ins. Co. v. Mabry* (2001) 274 Ga. 498 [556 S.E.2d 114, 123] (*Mabry*).) Farmers asserts the case does not pass muster under California law for three reasons: (1) Georgia law, unlike California law, requires insurers to compensate for the "diminished value" of a vehicle that has been wrecked and repaired; (2) the insurance company had no methodology in place to assess for diminished value justifying a court order requiring the insurance company to go back and look for a potential coverable loss for every policyholder in the prescribed class; and (3) the court failed to acknowledge the possibility that not every class member suffered damages and in California liability as to each class member must be established by common proof. Farmers is wrong.

First, the case is instructive because, like ours, it involves interpretation of an insurance contract—the outcome of which potentially will affect a class of policyholders. The legal underpinnings of the contract provision at issue are irrelevant. What matters is that in both cases it must be decided how courts can compel an insurance company to "perform contractual duties which the trial court has declared that party is obligated to perform." (*Mabry, supra*, 556 S.E.2d at p. 123.)

Contrary to Farmers' contention, the court found the insurer liable to each class member. Specifically, it was determined the insurer had breached its

contractual duty to each policy member in the prescribed class by failing to look for loss in diminished value. Farmers apparently forgets the *Mabry* court was not asked whether the class was properly certified but rather did the court abuse its discretion in ordering the injunction. As such, Farmers' criticism of the court's failure to address the issue of common proof is misplaced.

Farmers argues an injunction is not necessary because "the putative class members have an adequate remedy via individual breach of contract claims." However, as aptly pointed out by the Lebrillas, the amount of recovery for each class member makes separate small actions impractical. When arguing the motion below, their counsel explained that to prevail in a small claims action against Farmers, each plaintiff would have the added expense of hiring experts to testify about the "like kind and quality" of imitation crash parts. Obviously, this would make separate actions unlikely and is another reason justifying certification.

Undaunted, Farmers specifically targets class certification of the UCL claim. It asserts a UCL action already provides an "expedited mechanism for obtaining declaratory, injunctive and restitutionary relief on behalf of the general public" and thus, giving it class treatment is superfluous. In addition Farmers cautions, "Certification of [the] UCL claim would actually be detrimental to absent policy holders."

"[A] UCL claim is procedurally distinct from a class action and . . . the two have different purposes. However, the mere fact that they differ does not mandate a conclusion that they are incompatible. . . . [U]nder the proper circumstances set forth in Code of Civil Procedure section 382, certifying a UCL claim as a class action furthers the purposes and goals underlying both of these actions." (*Corbett v. Superior Court* (2002) 101 Cal.App.4th 649, 658 [125 Cal.Rptr.2d 46], fn. omitted.) A trial court " 'may conclude that the adequacy of representation of all allegedly injured borrowers would best be assured if the case proceeded as a class action. Before exercising its discretion, the trial court must carefully weigh both the advantages and disadvantages of an individual action against the burdens and benefits of a class proceeding for the underlying suit.' [Citation.]" (*Id.* at p. 660, italics omitted.)

The Lebrillas assert class certification in this case offers advantages to both sides. For plaintiffs, a class action is a stronger tool to ensure Farmers will be "required to give up wrongfully obtained" money. (*Corbett v. Superior Court, supra,* 101 Cal.App.4th at p. 671.) "[D]isgorgement of wrongfully obtained profits could be larger when the victims are not completely identified." (*Ibid.*) Farmers, as a class action defendant, "can achieve final repose of the claims against them." (*Ibid.*) "Judgments in individual

representative UCL actions are not binding as to nonparties. Thus, a defendant may be exposed to multiple lawsuits and therefore reluctant to settle a case that will not be final as to all injured parties. With a class action, each participating member of the class is a party to the lawsuit and subject to the court's jurisdiction." (*Ibid.*)

Farmers' suggestion a "class action would thwart the streamlined procedure intended by the UCL" was specifically addressed and rejected in *Corbett v. Superior Court, supra,* 101 Cal.App.4th at page 671. That court reasoned, "There is no evidence that the purpose of the lower standard of proof in a UCL claim was to offset the consequences of prohibiting a class action. Moreover, the streamlined procedure is designed to benefit the public; the consumer would have to balance the burden and expense of a class action by its potential benefit. Providing the plaintiff with this alternative would not obstruct the purpose of the UCL, nor would it place any greater burden on the defendants." (*Ibid.*) Farmers fails to offer any other disadvantage to certifying the UCL claim as a class action.

### ABANDONMENT OF CLAIMS

In its final argument, Farmers is highly critical of the Lebrillas' failure to seek class certification of every cause of action. Citing *City of San Jose v. Superior Court* (1974) 12 Cal.3d 447 [115 Cal.Rptr. 797, 525 P.2d 701], Farmers suggests the Lebrillas breached their fiduciary duty to the class by trying to achieve commonality for certification purposes by impermissibly abandoning a portion of the rights and remedies available to member of the putative class. It states an absent policyholder bound by any judgment in a certified UCL action would be forever barred from pursuing a breach of contract action or any other claim for damages.

The Lebrillas point out Farmers is essentially asking us to hold a class cannot be certified anytime the class representative fails to seek certification of fewer than all causes of action. Of course there is currently no such rule. "To maintain a class action, the representative plaintiff must adequately represent and protect the interests of other members of the class. [Citation.]" (*City of San Jose v. Superior Court, supra,* 12 Cal.3d at p. 463.) "When appropriate, an action may be maintained as a class action limited to particular issues." (Cal. Rules of Court, rule 1855(b); see also *Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 471 [174 Cal.Rptr. 515, 629 P.2d 23].)

In *City of San Jose,* the court determined class certification was inappropriate because the plaintiffs failed to "raise claims reasonably expected to be raised by the members of the class and thus pursue a course which, even

should the litigation be resolved in favor of the class, would deprive [the] class members of many elements of damage." (*City of San Jose v. Superior Court, supra,* 12 Cal.3d at p. 464.) In that case, the putative class was a group of people living under the flight pattern of the city airport. In an effort to achieve commonality, the representative plaintiffs sought damages only for diminution in market value. The court determined this decision effectively waived for "hundreds of class members, any possible recovery of potentially substantial damages—present or future. This they may not do." (*Ibid.*) "Damages recoverable in a successful nuisance action for injuries to real property include not only diminution in market value but also damages for annoyance, inconvenience, and discomfort [citation]; actual injuries to the land [citation]; and costs of minimizing future damages. [Citation.].)" (*Ibid.*)

Without explaining why, Farmers states class certification should have been sought for the breach of contract cause of action. Farmers fails to point out what the class would have to gain by this additional claim, in addition to the ones already alleged. Unlike the case in *City of San Jose,* exclusion of the claim does not waive a crucial or unique category of damages. As currently filed, the class action seeks full restitution to each class member "of all monies wrongfully acquired by Farmers resulting from its wrongful conduct." The Lebrillas note that had they sought certification on all causes of action, "Farmers would no doubt contend that a class action would be unwieldy." And, as the Lebrillas correctly point out, anyone dissatisfied with their potential relief in a class action has various remedies, including opting out of the class. (*Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4th 908, 925–926 [107 Cal.Rptr.2d 761].)

The order denying class certification is reversed. On remand, the trial court is directed to enter a new order granting the Lebrilla's motion seeking statewide class certification. Appellants shall recover their costs on appeal.

Rylaarsdam, Acting P. J., and Moore, J., concurred.

A petition for a rehearing was denied July 19, 2004, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied September 29, 2004. George, C. J., did not participate therein.