Filed 7/8/14  Hsu v. ODN Holding  Co. CA2/8

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| FREDERICK HSU, as Trustee etc., | B249206 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BC466381) |
| ODN HOLDING CORPORATION et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, John Shepard Wiley, Jr., Judge.  Affirmed.

Susman Godfrey, Marc M. Seltzer, Kathryn P. Hoek and Stephen E. Morrissey for Plaintiff and Appellant.

Wilson Sonsini Goodrich & Rosati, David J. Berger, Catherine E. Moreno for Defendants and Respondents Oak Hill Captial Partners III, L.P., Oak Hill Capital Management Partners III, L.P., Robert L. Morse and William J. Pade.

Bingham McCutchen, Stephen D. Alexander, Jennifer M. Sepic for Defendants and Respondents ODN Holding Corporation, Allen Morgan, Jeffrey Kupietzky, Scott Jarus and Kamran Pourzanjani.

Gibson Dunn & Crutcher and Douglas M. Fuchs for Defendant and Respondent Lawrence Ng.

* * * * * *

Plaintiff Frederick Hsu, as trustee of the Frederick Hsu Living Trust (Hsu), appeals a final judgment in favor of defendants and respondents ODN Holding Corporation (ODN); Oak Hill Capital Partners III, L.P., Oak Hill Capital Management Partners III, L.P. (together Oak Hill); Lawrence Ng, Robert L. Morse, Jr., Allen Morgan, William J. Pade, Jeff Kupietsky, Scott Jarus, and Kamran Pourzanjani, following the trial court's grant of summary adjudication of Hsu's claims for breach of contract and breach of fiduciary duties. We affirm.

## BACKGROUND

In 2000, Hsu and Ng founded Oversee.net, an online performance marketing network. In February 2008, they received a large investment from Oak Hill, and, as a result, Oversee.net became a wholly owned subsidiary of ODN, a Delaware corporation formed by Hsu and Ng to facilitate investment in Oversee.net. During the relevant period, ODN's board of directors consisted of Hsu and Ng; as well as defendants Morse and Pade (Oak Hill principals); Kupietzky (CEO and president of ODN); and Jarus, Morgan, and Pourzanjani. (Hereinafter the director defendants.)

In connection with Oak Hill's initial investment, Hsu was paid $30 million for some of his stock. According to Hsu, Morse and Pade began pressuring him and Ng to renegotiate the parties' various agreements to consolidate Oak Hill's control over ODN, including threatening to run the company "into the ground" if Oak Hill did not get what it wanted. Thereafter, ODN, Hsu, Ng, and Oak Hill entered into an amended and restated stockholders' agreement (the ASA) dated December 31, 2008. It provided in relevant part that if a significant shareholder desired to transfer shares, that shareholder must provide notice to ODN, which had a 20-day period to exercise its right of first refusal to purchase the shares offered for sale, and if ODN declined, Oak Hill, Hsu, and Ng had a right of first refusal as well as a right of co-sale to participate in the sale on a pro rata basis. Hsu and Ng also entered option agreements giving Oak Hill the option to purchase 25 percent of their ODN common stock at $2 per share.

Starting in May 2009, a strategic investor called YBrant indicated interest in purchasing ODN, eventually valuing ODN as high as $200 million, or $1 to $1.50 per

2

share. However, Pade expressed hesitation about YBrant as a prospective shareholder and informed Ng that Oak Hill wanted to put YBrant in a "holding pattern" to arrange for Oak Hill and ODN to purchase Ng's and Hsu's shares. Following several proposals from Oak Hill, on September 3, 2009, Ng submitted a first offer notice to ODN notifying ODN that he and Hsu wanted to transfer up to all of their common stock. The next day Oak Hill sent both Hsu and Ng term sheets, proposing to pay Ng $22 million for all of his shares ($0.53 per share) and pay Hsu around $3.2 million for the 8.5 million ODN shares he held subject to Oak Hill's option ($0.37 per share).

Around the same time, Hsu sent a competing offer to purchase 75 percent of Ng's shares for approximately $18 million ($0.5787 per share) through FWH Holdings, LLC (FWH), a company Hsu controlled. Hsu made the offer because he believed Oak Hill's proposal did not reflect the true value of ODN. Hsu also formally rejected Oak Hill's proposal.

Hsu and Ng requested a board meeting to discuss Oak Hill's and Hsu's proposals to purchase Ng's shares. According to Hsu, prior to that meeting, Oak Hill proposed a transaction in which Ng's shares would be allocated between Oak Hill and Hsu in a way that would still allow Oak Hill to control ODN. Hsu rejected that offer. Pade told Hsu that if Hsu bought Ng's shares, Oak Hill would block his choice of management, prevent the sale of ODN to anyone else, and block ODN's use of working capital.

Ng rejected Oak Hill's proposal on September 8, 2009. Later that day, Morse and Pade withdrew Oak Hill's offer and declared themselves disinterested directors, which allowed them to participate in ODN's decisionmaking.

The next day the board met to discuss Oak Hill's and Hsu's proposals to buy Ng's shares and ODN's rights and obligations in connection with them. At the meeting, Hsu withdrew his first offer notice and Hsu and Ng recused themselves, leaving the rest of the board to decide whether ODN should exercise its right of first offer to purchase Ng's shares. The nonrecused directors agreed to meet immediately after the meeting to discuss a potential offer by ODN.

3

Hsu claimed that, after this meeting, Pade and Morse continued to pressure Ng to sell to Oak Hill by offering Ng an additional $5 million to take their offer and deprive Hsu of control of ODN. Despite this alleged pressure and Pade and Morse's having "pleaded" with Hsu not to purchase Ng's shares, Ng indicated on September 17, 2009, he would accept Hsu's offer, although he remained open to better offers. Only a few days later, though, Ng changed course: on September 21, 2009, Ng told Hsu he had reached a deal to sell all his common stock to Oak Hill, not Hsu.

Hsu expressed "grave concerns" about the adverse impacts the transaction between Ng and Oak Hill would have on shareholders, urged ODN's directors to discharge their fiduciary duties, and stated he would avail himself of available legal and equitable remedies if the board permitted the transaction to proceed.

Nevertheless, on October 2, 2009, Ng and Oak Hill entered a common stock purchase agreement providing Ng would sell all his common stock for $0.7657654 per share (hereinafter the Oak Hill/Ng transaction), and Ng sent first offer transfer notices to ODN and Hsu, which triggered Hsu's right of first offer co-sale. The board held a meeting on the same day at Hsu's request to discuss his concerns with the Oak Hill/Ng transaction. The board decided that the nonrecused directors Jarus, Kupietzky, Morgan, and Pourzanjani (the disinterested directors)[1] would have further meetings to discuss the matter because the other directors were conflicted. The disinterested directors then held meetings on October 5, 12, and 16 to discuss Hsu's concerns.

Hsu's attorney sent a letter to ODN's outside counsel on October 8, 2009, outlining the "potentially profound negative impacts" on ODN from a change in control prompted by the Oak Hill/Ng transaction. Hsu accused the directors of failing to discharge their fiduciary duties to fully analyze the impact of the transaction on the control of ODN, establish the fairness of the transaction to the company and

---

[1] Hsu disputes these directors were disinterested. This dispute is immaterial to our analysis, so we refer to these individuals as "disinterested directors" purely for convenience.

4

stockholders, and investigate alternatives. Hsu believed the directors should either exercise ODN's right of first offer under the ASA, require a standstill agreement from the parties or condition ODN's nonexercise of its right of first offer on amending the ASA to protect minority shareholders, or explore a sale of ODN for a fairer share price. Hsu further claimed the directors failed to satisfy their duty of care in considering the proposed transaction, failed to adhere to the ASA requiring proper notice of the right of first offer and good faith negotiations over ODN's rights, and failed to discharge the duty of candor by not disclosing their intentions regarding the Oak Hill/Ng sale.

In this same letter, Hsu also outlined his "grave concerns" about Oak Hill and Ng's "oppressive conduct," including Oak Hill's "extracting of the purchase options from [Hsu] and [Ng] under trumped-up pretexts"; Pade's and Morse's "repeated reckless statements regarding incurring damage to [ODN] and to [Hsu] in order to recoup [Oak Hill's] investment"; the board's failure to follow up on a credible third party offer to buy ODN; Pade's and Morse's "reckless statements regarding incurring damage to [ODN]" when they found out Hsu made an offer to buy Ng's shares; Oak Hill's "cynical and transparent rescinding of its original offer to [Ng] in order to create the appearance of disinterestedness and thereby dominate, intimidate, and influence Board discussions regarding [Hsu's] offer to [Ng], only to be followed shortly thereafter by [Oak Hill] making another offer to buy [Ng's] shares"; Pade's, Morse's, and Ng's "actions and nonactions" in response to Hsu's concerns; and the parties' inclusion of a standstill provision in the Oak Hill/Ng agreement, which "attempts to discourage/prevent [Hsu] and other minority shareholders from the opportunity to sell shares to [Oak Hill] on the same terms as [Ng]."

In closing Hsu stated, "The fecklessness of the Board and the breaches of applicable fiduciary duties with respect to these matters and the change of control transaction are alarming." He requested a response to this letter by October 14, 2009, and if he did not receive one, he threatened "to seek all available legal and equitable remedies at his disposal."

5

At the October 12, 2009 meeting of the disinterested directors, Hsu was given the opportunity to present his concerns. ODN's Delaware counsel also sent him a lengthy letter on October 14, 2009, responding to his October 8, 2009 letter and informing him the disinterested directors had determined it was not in the best interests of ODN or its stockholders to make an offer for Ng's shares. They also were unaware of any basis to impose a standstill agreement on Oak Hill and Ng or to compel ODN to put itself up for sale.

Hsu sent an e-mail on October 16, 2009, again accusing Oak Hill of a "pattern of egregious and oppressive conduct" and repeating his prior allegations.

During this period, Hsu developed an alternative proposal with YBrant to purchase all of ODN's shares of common stock through FWH, backed by YBrant (hereinafter the FWH/YBrant proposal). On October 21, 2009, Hsu presented a letter of intent for the proposed purchase, under which the common stockholders would receive either $1 per share immediately or $1.50 per share after six months. In presenting this proposal, Hsu claimed Ng's first offer notice for the Oak Hill/Ng transaction was deficient under the ASA and expressed an "intent to commence litigation later this week against the Board and [ODN] in connection with the transaction for sale of common stock between [Ng] and Oak Hill." He again requested the board impose a standstill with regard to the Oak Hill/Ng transaction.

On October 22, 2009, several events occurred. Hsu submitted his own first offer transfer notice to ODN, announcing his intent to sell more than 25 million shares of ODN common stock to FWH/YBrant for $1 per share. He also served on Ng a first offer transfer notice to preserve his ability to exercise his co-sale rights under the ASA in the event the Oak Hill/Ng transaction proceeded and the FWH/YBrant proposal did not, claiming he did this to mitigate his damages. And ODN's 20-day period to exercise its right of first refusal to purchase any of Ng's shares expired.[2]

---

[2]     Hsu disputes that ODN's right of first refusal expired on October 22, 2009, 20 days after Ng issued his first offer transfer notice on October 2, 2009, because the first

6

The disinterested directors held a telephonic "informational call" at 11:00 a.m. on the same day, during which they discussed and revised a draft "report of disinterested directors" created by counsel to summarize findings reached by the disinterested directors at their October 16, 2009 meeting regarding Hsu's concerns over the Oak Hill/Ng transaction (the October 22 report, the contents of which are discussed below). They also discussed the October 21, 2009 letters from FWH and Hsu's counsel, noting Hsu "expected to commence litigation" against ODN and "certain shareholders" over the Oak Hill/Ng transaction. The disinterested directors nonetheless reached "unanimous consensus" that the letters did not change their conclusions in the October 22 report.

That afternoon ODN's general counsel circulated by e-mail to the full board, including Hsu and Ng, a notice of a special board meeting for the next day, October 23, 2009. Attached to that e-mail was the final October 22 report discussed at the earlier meeting. It recited the events surrounding the transactions involving Hsu, Ng, and Oak Hill and recommended the following: there was no "credible basis for concluding that the proposed sale of shares to Oak Hill pursuant to the [ASA] presents a threat to [ODN] or its stockholders warranting a defensive response designed to prevent, impede, or substantially delay all or any part of the proposed sale"; even if the transaction presented a threat, the types of defensive responses available would be "limited"; if ODN had the ability to impede the transaction, such response would not be "reasonable and proportionate" to the threat or in the best interests of ODN and its stockholders; and it

_____

offer transfer notice form attached to the ASA provides a 30-day period for ODN to exercise its rights of first refusal. This appears to have been nothing more than a typographical error in the form notice. The ASA provides for a 20-day period to exercise the right of first refusal and the form notice itself notes in bold at the bottom that the offering shareholder "must receive your notice by the date 20 days after the date this notice is deemed to have been delivered to you. There is no extension of this deadline." (Boldface and capitalization omitted.) Further, Ng's first offer transfer notice identified the error in the notice period and corrected the error on the notice he issued. Even Hsu corrected this same error in the first offer transfer notice he sent to Ng preserving his co-sale rights.

would not be in ODN's or the stockholders' best interests to make an offer to buy Ng's shares.

After receiving the October 22 report,[3] Hsu filed a complaint in the Delaware Court of Chancery (the Delaware complaint) that evening against ODN and Ng in his capacity as trustee of the Lawrence Ng Living Trust. The Delaware complaint sought to enjoin Ng from selling his shares in ODN to Oak Hill because Ng's first offer notice did not comply with the ASA, which did not inform ODN of a change in control and prevented ODN and the board from fully complying with their duties to negotiate for a right of first offer. The Delaware complaint alleged facts tracking those recited above and alleged a single cause of action for breach of the ASA.

On October 23, 2009, the day after the Delaware complaint was filed, the board held a meeting with Morse, Hsu, and three of the disinterested directors. The three disinterested directors voted to formally approve the October 22 report (Morse and Hsu recused themselves). They also discussed the FWH/YBrant proposal. On behalf of Oak Hill, Morse expressed interest in learning more about it, but Oak Hill was "not willing to delay the closing of its purchase of shares of common stock from [Ng] in the interim, as it had already contractually committed to close such purchase." The disinterested directors also rejected Hsu's request for a standstill agreement.

After this meeting, Hsu continued his efforts to convince the board to consider the FWH/YBrant proposal. For example, on October 26, 2009, Hsu informed the board FWH's offer would be extended to October 30, 2009, and again requested a standstill for the Oak Hill/Ng transaction. Hsu also notified the board that YBrant had removed its financing contingency.

Despite Hsu's efforts, the Oak Hill/Ng transaction closed on October 27, 2009. In response to this development, Hsu wrote in an e-mail the closing of the transaction

---

[3] Hsu concedes he received the October 22 report before he filed the Delaware complaint, but he claims to have received it "after the [Delaware] Complaint had been finalized and was on its way to the courthouse for filing."

8

"forces [him] to amend [his] lawsuit and name Oak Hill," although he never did. YBrant also withdrew its offer to participate with FWH to purchase ODN's common stock.

Hsu repeated his accusations regarding the transaction in an October 30, 2009 letter and discussed the matter further with Pade and Morse, during which he received, in his view, "assurances about the future of ODN and the security of [his] equity in the company." Allegedly based on those assurances and because the closing of the transaction rendered his claim for injunctive relief moot, Hsu dismissed the Delaware complaint with prejudice on November 5, 2009. The next day he exercised his co-sale rights and sold more than 14 million shares of his common stock to Oak Hill for $10.8 million ($0.7657654 per share) in order to "mitigate his damages." Hsu did not execute any release of his claims, although he claimed Oak Hill sought one after he dismissed the Delaware complaint.

Hsu thereafter continued to evaluate his claims, and he pursued corporate information to that end. In one letter, he rejected the notion that dismissal of the Delaware complaint affected his right to seek information related to the board's fiduciary duties.

Hsu (and other coplaintiffs not relevant to this appeal) filed the complaint in this case on July 27, 2011 (the California complaint), alleging basically the same facts recited above and asserting claims for breach of fiduciary duty against all defendants except ODN and breach of contract against ODN.[4] Defendants filed a motion for summary adjudication, arguing Hsu's claims were barred by res judicata, equitable estoppel, and ratification. Finding res judicata barred the California complaint, the trial court granted the motion. The trial court eventually entered a stipulated judgment dismissing Hsu's remaining claims. Hsu timely appealed.

---

[4] On August 17, 2011, defendants filed a declaratory judgment action in Delaware, but the Delaware court stayed that case pending resolution of the California complaint.

9

## LEGAL STANDARD

"Summary judgment or summary adjudication is appropriate when no triable issue of material fact remains and the moving party is entitled to judgment or adjudication as a matter of law.  [Citations.]  A trial court's decision on a motion for summary judgment or summary adjudication is reviewed de novo, viewing the evidence in the light most favorable to the nonmoving party."  (*Conejo Wellness Center, Inc. v. City of Agoura Hills* (2013) 214 Cal.App.4th 1534, 1548; see Code Civ. Proc., § 437c, subds. (c), (f).)

## DISCUSSION

The parties agree Delaware law governs the application of res judicata in this case. (*Gagnon Co., Inc. v. Nevada Desert Inn* (1955) 45 Cal.2d 448, 453.)  In applying Delaware law, we may rely on Delaware court opinions that have not been officially published, although they are merely "'persuasive . . . depending on the point involved.'" (*Lebrilla v. Farmers Group, Inc.* (2004) 119 Cal.App.4th 1070, 1077.)

In Delaware, res judicata bars a second claim when "(1) the court making the prior adjudication had jurisdiction, (2) the parties in the present action are either the same parties or in privity with the parties from the prior adjudication, (3) the cause of action must be the same in both cases or the issues decided in the prior action must be the same as those raised in the present case, (4) the issues in the prior action must be decided adversely to the plaintiff's contentions in the instant case, and (5) the prior adjudication must be final."  (*Bailey v. City of Wilmington* (Del. 2001) 766 A.2d 477, 481.)  Hsu does not dispute the first, fourth, and fifth elements, so we will focus on the remaining two—whether the causes of action are the same and whether the defendants were in privity.

### 1.  Same Causes of Action

Delaware follows a "transactional approach" to res judicata.  (*RBC Capital Markets, LLC v. Education Loan Trust IV* (Del. 2014) 87 A.3d 632, 645 (*RBC Capital Markets*); *LaPoint v. AmerisourceBergen Corp.* (Del. 2009) 970 A.2d 185, 193 (*LaPoint*).)  Under this "modern transactional view," a claim is barred if it "arose from the same transaction that formed the basis of the prior adjudication.  [Citations.]  The determination, therefore, whether the doctrine shall be invoked is now based on the

10

underlying transaction and not on the substantive legal theories or types of relief which are sought. Under the modern rule, ordinarily, a transaction gives rise to only one claim regardless of the number of ways that the claim may be asserted." (*Maldonado v. Flynn* (Del.Ch. 1980) 417 A.2d 378, 381.) Thus, even if different substantive theories are alleged in each action, the question is whether the claims "aris[e] from but one transaction." (*Id.* at p. 382.)

"Determining whether two claims arise from the same transaction requires pragmatic consideration, with the fact finder 'giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.' Two claims 'derive[d] from a common nucleus of operative fact[s]' arise from the same transaction." (*LaPoint, supra*, 970 A.2d at p. 193, fns. omitted.) Moreover, if the second action raises issues not raised in the first action, the question is whether "'the pleadings framing the issues in the first action would have permitted the raising of the issue sought to be raised in the second action, and *if the facts were known, or could have been known to the plaintiff in the second action at the time of the first action*.'" (*Ibid.*; see *id.* at pp. 193-194 ["[T]o assert *res judicata* as a bar to a plaintiff's claim, in addition to showing that the same transaction formed the basis for both the present and former suits, the defendant must show that the plaintiff 'neglected or failed to assert claims which in fairness should have been asserted in the first action.'"].)

In the California complaint, Hsu essentially alleged defendants breached their fiduciary and contractual duties by (1) failing to exercise ODN's right of first offer; (2) failing to pursue the FWH/YBrant proposal; (3) refusing to allow YBrant and FWH to conduct due diligence; (4) refusing to seek a "standstill" agreement to enable those steps to occur; and (5) refusing to seek an auction process to ensure that minority shareholders received the maximum value for their shares. Hsu does not contend these allegations and the allegations in the Delaware complaint involved different transactions for res judicata purposes, nor could he, given the claims in the two complaints were based on the same

11

series of facts. Instead, he argues he could not have raised his current breach of contract and breach of fiduciary duties claims when he filed the Delaware complaint because they were based on two events that had not yet occurred: the October 23, 2009 meeting during which ODN formally adopted the October 22 report rejecting Hsu's objections to the Oak Hill/Ng transaction; and the October 27, 2009 closing of the Oak Hill/Ng transaction. We disagree.

Hsu is correct that res judicata "does not operate to bar claims based on facts that were not, and could not have been, known to the plaintiff in the second action at the time of the first action." (*LaPoint, supra*, 970 A.2d at p. 193; see *RBC Capital Markets, supra*, 87 A.3d at p. 646 ["The *res judicata* doctrine operates to bar only later claims that could have been brought at the time of an earlier asserted claim."].) The parties treat Hsu's argument as an issue of whether Hsu's claims were ripe at the time he filed the Delaware complaint. Under Delaware law, claims based on events that postdate the first complaint may be ripe when those events are the inevitable results of prefiling events. (See *Bebchuk v. CA, Inc.* (Del.Ch. 2006) 902 A.2d 737, 742 [refusing to act on challenge to bylaw yet to be adopted, but noting the court would be more likely to act if the bylaw "would inevitably be adopted in the proposed form" or there was a "precommitment among the stockholders" to vote for the bylaw].)

Here, ODN's formal adoption of the October 22 report the day after Hsu filed the Delaware complaint and the closing of the Oak Hill/Hsu transaction five days later were the inevitable results of ODN's and the disinterested directors' rejection of Hsu's concerns over the Oak Hill/Ng transaction, which occurred before Hsu filed his Delaware complaint. As early as September 23, 2009, almost a month prior to filing the Delaware complaint, Hsu expressed "grave concerns" about the Oak Hill/Ng transaction, urged the directors to discharge their fiduciary duties, and threatened to avail himself of available legal and equitable remedies if the board permitted the transaction to proceed. Despite this, Oak Hill and Ng signed the common stock purchase agreement on October 2, 2009. Growing more concerned the Oak Hill/Ng transaction would proceed, in his October 8, 2009 letter Hsu outlined the Oak Hill/Ng transaction's "potentially profound negative

12

impacts" on ODN and accused the directors of, among other things, failing to discharge their fiduciary duties and to establish the fairness of the transaction. Hsu believed the directors should either exercise ODN's right of first offer, require a standstill agreement, or explore a sale of ODN for a fairer share price. Hsu also chronicled Oak Hill's and Ng's "oppressive conduct" with regard to the transaction. Notably, in closing Hsu assumed the directors had already breached their fiduciary duties when he threatened legal action and stated, "The fecklessness of the Board and the *breaches of applicable fiduciary duties with respect to these matters and the change of control transaction* are alarming." (Italics added.)

In ODN's October 14, 2009 response, ODN's counsel informed Hsu ODN would not make an offer for Ng's shares, no basis existed to impose a standstill agreement on Oak Hill and Ng, and no authority existed compelling ODN to put itself up for sale. If Hsu had any remaining doubts that ODN would not interfere with the Oak Hill/Ng transaction, they were eliminated by the October 22 report rejecting his concerns, which the disinterested directors adopted with "unanimous consensus" on the morning of October 22, 2009, and circulated to the full board, including Hsu, that afternoon, before Hsu filed the Delaware complaint. Although the board did not formally adopt the October 22 report until the next day, the same disinterested directors who approved it were the ones who would be voting on whether to adopt it on behalf of ODN, so its adoption was assured. Further, ODN's 20-day period to exercise its right of first refusal to purchase any of Ng's shares expired on October 22, 2009, so Hsu knew at that point ODN would not be offering to purchase Ng's shares. Given these facts, Hsu should have readily known the board's formal refusal on October 23, 2009, to take any action with regard to the Oak Hill/Ng transaction was entirely expected, and indeed, inevitable and that the Oak Hill/Ng transaction would close shortly thereafter.

Hsu suggests the board's refusal to intervene in the Oak Hill/Ng transaction was not inevitable because the October 22 report did not discuss the FWH/YBrant offer, which was discussed for the first time at the October 23, 2009 meeting. While true, Hsu has pointed to nothing to suggest the board would have been open to delaying the Oak

13

Hill/Ng transaction based on this offer. Indeed, before sharing the FWH/YBrant proposal on October 21, 2009, Hsu urged the board in his October 8, 2009 letter to consider a sale of ODN for a higher share price and noted the board's failure to follow up on a recent offer to buy ODN. Yet in the October 14, 2009 letter, ODN's counsel found no authority to compel a sale of ODN, strongly suggesting the formal offer Hsu presented on October 21, 2009, was not going to (and ultimately did not) change the board's decision.

Despite Hsu's contrary argument, it did not matter that his claim for damages may not have been available because "[w]hether or not the plaintiffs could have sued for damages is not dispositive as to whether the claim accrued, since, as soon as the alleged wrongful act occurred, the plaintiffs could have sought injunctive relief." (*Albert v. Alex. Brown Management Services, Inc.* (Del.Ch. 2005) 2005 WL 5750601, *18; cf. *Horizon Personal Communications, Inc. v. Sprint Corp.* (Del.Ch. 2006) 2006 WL 2337592, *20 [a court may enjoin a threatened breach of contract].) That is exactly what Hsu did when he filed the Delaware complaint seeking an injunction. If the closing of the Oak Hill/Ng transaction and ODN's refusal to intervene in it were imminent enough for Hsu to seek an injunction on October 22, 2009, then those events were imminent enough for Hsu to raise all his claims in his Delaware complaint or risk being barred from raising them later.[5]

Neither *LaPoint* nor *RBC Capital Markets* convinces us otherwise. Both cases involved the principle that, while a "contract is considered to be a single 'transaction' for

---

[5] Hsu cites two cases to argue his breach of fiduciary duties and breach of contract claims were not ripe, but both are distinguishable. In *eBay Domestic Holdings, Inc. v. Newmark* (Del.Ch. 2009) 2009 WL 3205674, the court held fiduciary duty and waste claims were unripe because the indemnification agreements at issue had not been executed by the defendants and would not be in the future. (*Id.* at p. *2.) In *In re IAC/InterActive Corp.* (Del.Ch. 2008) 948 A.2d 471, the parties recognized and the court agreed the fiduciary duty claims at issue were unripe because the board had not yet acted on the challenged transaction and the claim would "depend on a factual record that has yet to be developed." (*Id.* at pp. 492-493.) Unlike these cases, by the time Hsu filed the Delaware complaint, it was clear his objections to the Oak Hill/Ng transaction would be rejected and the transaction would move forward.

the purpose of claim preclusion," "[c]ontractual rights that are triggered and pursued *after* the initial action is filed . . . are not barred by res judicata because a prior judgment 'cannot be given the effect of extinguishing claims which did not even then exist.'" (*LaPoint, supra*, 970 A.2d at p. 194; see *RBC Capital Markets, supra*, 87 A.3d a pp. 646-647, quoting *LaPoint*.)  In *LaPoint*, the court rejected the application of res judicata to bar an indemnification claim based on a merger agreement because that claim did not ripen until two events occurred:  the defendant was held liable in the first action for breach of the merger agreement; and the defendant subsequently refused to honor its indemnification obligation.  (*LaPoint, supra*, at pp. 194-195.)  Similarly, in *RBC Capital Markets*, the court found res judicata did not bar claims for breach of contract because those claims were based on future obligations to pay interest that "had not yet materialized."  (*RBC Capital Markets, supra*, at p. 647.)

Here, in contrast, by the time Hsu filed the Delaware complaint all the facts supporting his causes of action had been established, leaving only the inevitable acts of ODN adopting the October 22 report and Ng and Oak Hill closing their transaction. Thus, the same transaction requirement for res judicata was satisfied.

## 2. Privity

Hsu named only Ng and ODN as defendants in the Delaware complaint, whereas he named ODN, Oak Hill, Ng, and the director defendants in the California complaint. Still, res judicata "bars a party from litigating the same cause of action after a judgment has been entered in a prior suit involving the same parties *or their privies*."  (*Aveta Inc. v. Cavallieri* (Del.Ch. 2010) 23 A.3d 157, 179.)  For res judicata purposes, parties are in privity when "'the relationship between two or more persons is such that a judgment involving one of them may justly be conclusive on the others, although those others were not party to the lawsuit.'"  (*Levinhar v. MDG Medical, Inc.* (Del.Ch. 2009) 2009 WL 4263211, at p. *8 (*Levinhar*).)  "A critical factor for the privity analysis is whether the interests of a party to the first suit and the party in question in the second suit are aligned," which may "'place two superficially separate parties in privity.'"  (*Ibid.*)  At

15

bottom, "'the test of privity is whether there is a "close or significant relationship between successive defendants."'" (*Ibid.*)

There is little question privity exists in this case. As ODN directors, the director defendants and Ng shared a close relationship. Oak Hill and Ng shared a close relationship through the Oak Hill/Ng transaction and their interests aligned because Hsu brought the Delaware complaint to "enjoin Ng's sale of his outstanding shares of common stock in ODN" to Oak Hill, which would have prevented Oak Hill from buying those shares from Ng. ODN shared a close relationship with the director defendants and their interests precisely aligned because Hsu repeatedly referred to the directors' duties in the Delaware complaint, and ODN could have only responded to the Oak Hill/Ng transaction through its directors. (*Arnold v. Society for Sav. Bancorp, Inc.* (Del. 1996) 678 A.2d 533, 540 ["The board of directors of a corporation is charged with the ultimate responsibility to manage or direct the management of the business and affairs of the corporation. 8 *Del. C.* § 141(a)."].)

Finally, all of the defendants' interests aligned in favor of the Oak Hill/Ng transaction and in opposition Hsu's challenges to it—Oak Hill and Ng certainly wanted it to proceed and the disinterested directors approved the October 22 report rejecting Hsu's objections to it, which ODN adopted. Indeed, in the California complaint Hsu alleged all the defendants acted together to breach their fiduciary and contractual duties by enabling the Oak Hill/Ng transaction to proceed, indicating Hsu believed the defendants' interests were aligned. (See *Levinhar, supra*, 2009 WL 4263211, at p. *10, fn. 41 [finding privity in part because the plaintiffs "essentially argue that all of the defendants are affiliates and coconspirators" and "worked together to deny [the plaintiffs] their rights"].) Thus, the director defendants and Oak Hill were in privity with ODN and Ng as required for res judicata to apply.

### 3. *Other Grounds*

Because defendants' res judicata defense is dispositive, we need not address defendants' other arguments related to equitable estoppel and ratification.

**DISPOSITION**

The judgment is affirmed.  Respondents are awarded costs on appeal.

FLIER, J.

WE CONCUR:

BIGELOW, P. J.

RUBIN, J.